679 S.E.2d 628

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Tanya D. HARDEN, Defendant Below, Appellant.**

No. 34268.

Supreme Court of Appeals of West Virginia.

Submitted April 8, 2009.

Decided June 4, 2009.

Dissenting Opinion of Chief Justice Benjamin July 27, 2009.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, WV, for Appellee.

Russel S. Cook, Esq., J.L. Hickok, Esq., West Virginia Public Defender Services, Charleston, WV, for Appellant.

KETCHUM, J.:

This case is before the Court upon the appeal of Tanya A. Harden (defendant) from the final order of the Circuit Court of Cabell County sentencing the defendant to a term of life imprisonment with the possibility of parole following defendant's conviction for first degree murder.

The defendant, who asserted a claim of self-defense at trial, has submitted several assignments of error in support of her appeal. After careful consideration of the parties' arguments, the record, and relevant authorities, we find one of those assigned errors to be dispositive. Specifically, we find that the State failed to prove beyond a reasonable doubt that the defendant's actions were not made in self-defense. Accordingly, for the reasons set forth in this opinion, we vacate the defendant's conviction and remand this matter to the circuit court with directions to enter a judgment of acquittal.

## I.

### Background

On September 5, 2004, the defendant was arrested upon her admission to having shot and killed her husband, Danuel Harden. At trial, the defendant asserted a claim of self-defense, arguing that her actions precipitously followed a "night of domestic terror" that ended only when the defendant shot and

killed the decedent. The evidence adduced [1] at the defendant's trial showed that the decedent, while drinking heavily (with a blood alcohol count ultimately reaching 0.22% at the time of his death) subjected the defendant to a several-hour-long period of physical and emotional violence. This violence included the decedent brutally beating the defendant with the butt and barrel of a shotgun, brutally beating the defendant with his fists, and sexually assaulting the defendant. An emergency room physician at Cabell Huntington Hospital, who examined the defendant on the morning of the shooting, testified that the defendant "had contusions of both orbital areas, the right upper arm, a puncture wound with a foreign body of the right forearm, contusions of her chest, left facial cheek, the left upper lip" and that "X-rays done at the time demonstrated a nasal fracture."

In addition to the physical violence summarized above, the evidence adduced at trial also showed that the decedent repeatedly threatened to kill the defendant and the defendant's nine-year-old son B.H.,[2] ten-year-old daughter A.H., and ten-year-old B.K. (a friend of A.H.'s who had been invited for a "sleep over"). This evidence included testimony from two of the children. B.H. testified to seeing and hearing the decedent say to the defendant "I am going to go get the gun and shoot you" and that the decedent did, in fact, go to a back room in the defendant's home and get a shotgun, and returned to the room with the gun where the decedent subsequently struck the defendant with the butt of the gun in the shoulders and arms while she was seated in a recliner. In addition to B.H.'s testimony, B.K. also testified that she was frightened by what she could hear from her bedroom and had difficulty falling asleep, and that after finally falling asleep, she was awakened by more sounds of fighting, at one point over-hearing the defen-

dant say to the decedent that "she didn't want to get killed with her two kids."

It is conceded by the State that the defendant suffered a "night of domestic terror." During its opening statement the State described the evening's violence as a "knock-down-drag-out" fight. By the time of the State's closing argument, the State conceded to the jury that "Yes, she had a night of terror." In its brief to this Court, the State concedes that the decedent's death followed an "evening of physical and sexual abuse."

Notwithstanding the fact that it does not dispute that the defendant endured a night of extreme violence at the hands of the decedent, the State nonetheless argues that the defendant's claim of self-defense is "untenable." In its closing argument, the State argued to the jury that "the law ... on self-defense says that in order to use deadly force in self-defense you must find that the apprehension existed at the time the defendant attacked, or in this case shot, the [decedent]." In addition, the State maintained that the defendant did not have a reasonable basis to apprehend any danger from the decedent at the time she used deadly force against the decedent because there had been a "cooling off" period, and the evidence showed that the decedent was lying down on a couch possibly "asleep" or, alternately, possibly "passed out drunk" when the defendant shot him.[3] The State further argued to the jury that the defendant's use of deadly force was not reasonable because the defendant could have retreated from any danger posed by the decedent, evidenced by the fact that the decedent "is on that couch with a BAC of .22 and she has got control of that shotgun, she ... could have called the law, and she could have walked out of that trailer. Period. But she didn't."

---

1. We discuss in significant detail the evidence adduced at the defendant's trial in Section III, *infra*. To minimize redundancy, we provide only a brief summary of this evidence for purposes of a "Background."

2. In keeping with our customary practice in cases involving the testimony of minor children, we refer to the children in this appeal only by their initials.

3. In our discussion, *infra*, of the State's duty to have proven beyond a reasonable doubt that the defendant did not act in self-defense, the fact that the State resorts to "suspicion and conjecture" when describing the decedent's disposition at the time he was shot has not escaped us.

## II.

### *Standard of Review*

On appeal the defendant argues that the State failed to submit sufficient evidence to prove beyond a reasonable doubt that her actions were not made in self-defense. We have previously held that "[a] reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice." Syllabus Point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927). *Accord* Syllabus Point 1, *State v. Easton*, 203 W.Va. 631, 510 S.E.2d 465 (1998).

We have further held that:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syllabus Point 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

With these standards in mind, we turn to the issues presented.

## III.

### *Discussion*

Given the complexity of the issues raised in our analysis of whether the State submitted sufficient evidence to prove, beyond a reasonable doubt, that the defendant's actions were not made in self-defense, we will divide our discussion into three sections. In Section III.1., we address the State's argument that the defendant's use of lethal force was unreasonable because our law precludes an "apprehension of danger previously entertained," *i.e.*, prior threats of violence or acts of violence, as justifying the use of deadly force. In Section III.2., we address the State's argument that the defendant's actions were unreasonable because the defendant had a duty to retreat from her home in lieu of using deadly force against the decedent. In Section III.3., we address the sufficiency of the State's evidence.

### III.1.

### *Apprehension of Danger*

A long-standing tenet of our self-defense doctrine is that a defendant's use of deadly force must be based upon a reasonable apprehension by the defendant that he or she was at imminent peril of death or serious bodily injury. In Syllabus Point 8 of *State v. Cain*, 20 W.Va. 679 (1882), we held that:

In such a case as to the imminency of the danger, which threatened the prisoner, and the necessity of the killing in the first instance the prisoner is the judge; but he acts at his peril, as the jury must pass upon his action in the premises, viewing said actions from the prisoner's stand-point at the time of the killing; and if the jury believe from all the facts and circumstances in the case, that the prisoner had reasonable grounds to believe, and did believe, the danger imminent, and that the killing was necessary to preserve his own life or to protect him from great bodily harm, he is excusable for using a deadly weapon in his defense, otherwise he is not.

In the case before us, it is clear that the State does not believe that the defendant had a reasonable basis to believe that she was in imminent danger of death or serious bodily injury at the time she used deadly force against the decedent. The State acknowledges that the decedent's death followed an "evening of physical and sexual abuse" inflicted upon the defendant by the decedent, but argues notwithstanding this "night of terror" a reasonable juror could have found that the defendant's use of lethal force was not reasonable under our law.

The State's argument on this point is straightforward. Our law, the State argues, requires that deadly force be employed only to repel an apprehension of death or serious bodily injury existing at the time deadly

force is used, and specifically excludes any apprehension of danger *previously entertained* as justifying the use of deadly force. Under the circumstances of the defendant's case, the State argues, the defendant did not have a reasonable basis to apprehend *any* imminent danger from the decedent at the time she used deadly force because the facts suggested that there had been a "cooling off" period after the decedent's violent acts. Therefore, the State argues, because the decedent's violent acts had ended, those violent acts constituted "an apprehension of danger previously entertained" and could not justify the defendant's use of deadly force.

It is clear from the record that the State bases its arguments largely on Syllabus Point 6 of our decision in *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927)(emphasis added), where we held that:

> Under his plea of self-defense, the burden of showing the imminency of the danger rests upon the defendant. *No apprehension of danger previously entertained will justify the commission of the homicide; it must be an apprehension existing at the time the defendant fired the fatal shot.*

It is also clear that the State bases its argument on the trial court's self-defense instruction. This self-defense instruction, which was offered by the State, contained the following language relevant to the issue of the reasonableness of the defendant's belief that death or serious bodily injury was imminent:

> In order for the Defendant to have been justified in the use of deadly force in self-defense, she must not have provoked the assault on her or have been the aggressor. Mere words, without more, do not constitute provocation or aggression. Furthermore, *you must find that the apprehension existed at the time that the defendant attacked the victim. No apprehension of danger previously entertained will justify the commission of homicide.* (Emphasis added).[4]

It is obvious that the referenced portion of the trial court's self-defense instruction was based entirely on Syllabus Point 6 of *State v. McMillion, supra*. The question our review thus presents is whether Syllabus Point 6 of *McMillion*, and the State's argument based thereon, conflicts with our more recent precedent holding that *prior* physical and mental abuse by a decedent *is* relevant evidence on the issue of the reasonableness of a defendant's belief that death or serious bodily injury were imminent. We find that it does.

■ We begin our analysis by noting that our precedent establishes that the "reasonableness" of a defendant's belief that he or she was at "imminent" risk of death or seri-

---

4. The entire instruction, as given, is as follows:

STATE'S INSTRUCTION NO. 12
(As Modified)

The Court instructs the jury that one of the questions to be determined by you in this case is whether or not the Defendant acted in self-defense so as to justify her acts. Under the laws of this State, if the Defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that she was in imminent danger of death or serious bodily harm from which she could save herself only by using deadly force against her assailant, then she had the right to employ deadly force in order to defend herself. By deadly force is meant force which is likely to cause death or serious bodily harm.

In order for the Defendant to have been justified in the use of deadly force in self-defense, she must not have provoked the assault on her or have been the aggressor. Mere words, without more, do not constitute provocation or aggression. Furthermore, you must find that the apprehension existed at the time that the defendant attacked the victim. No apprehension of danger previously entertained will justify the commission of homicide.

The circumstances under which she acted must have been such as to produce in the mind of a reasonable prudent person, similarly situated, the reasonable belief that the other person was then about to kill her or to do her serious bodily harm. In addition, the defendant must have actually believed that she was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it.

If evidence of self-defense is present, the State must prove beyond a reasonable doubt that the Defendant did not act in self defense. If you find that the State has failed to prove beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant not guilty. In other words, if you have a reasonable doubt as to whether or not the Defendant acted in self-defense, your verdict must be not guilty.

Given As Modified:
Alfred E. Ferguson, Judge.

ous bodily injury is a two-part inquiry, with a subjective component and an objective component. In Syllabus Point 8 of *State v. Cain, supra,* we described this inquiry as requiring that "the jury must pass upon [the defendant's] action in the premises, viewing said actions from the [defendant's] stand-point at the time of the killing[.]" We further held in Syllabus Point 8 of *State v. Cain* that the jury must believe from "all the facts and circumstances in the case, that the [defendant] had reasonable grounds to believe, and did believe, the danger imminent."

More recently, we addressed the reasonableness inquiry in *State v. Cook,* 204 W.Va. 591, 515 S.E.2d 127 (1999), where we concluded that the two-part inquiry required a finding that a defendant "actually believe that [she] is in danger and that belief must be a reasonable one." *State v. Cook,* 204 W.Va. 591, 601, 515 S.E.2d 127, 137, *citing State v. Elam,* 328 N.W.2d 314, 317 (Iowa 1982) ("[T]he test of justification is both subjective and objective. The actor must actually believe that he is in danger and that belief must be a reasonable one.").

Plainly stated, the reasonableness inquiry is as follows. First, a defendant's belief that death or serious bodily injury was imminent must be shown to have been subjectively reasonable, which is to say that a defendant actually believed, based upon all the circumstances perceived by him or her at the time deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, that the defendant's belief must be objectively reasonable when considering all of the circumstances surrounding the defendant's use of deadly force, which is to say that another person, similarly situated, could have reasonably formed the same belief.

 Having thus briefly summarized the standard by which the reasonableness of the defendant's actions are measured, we turn to the issue of *McMillion's* absolute prohibition that no "apprehension of danger previously entertained" may be used to justify a homicide as having been committed in self-defense.

Our precedent since *McMillion* clearly establishes that a defendant, who has been the victim of domestic violence that tragically ends with the defendant's killing the battering spouse, is entitled "to elicit testimony about the prior physical beatings she received in order that the jury may fully evaluate and consider the defendant's mental state at the time of the commission of the offense." *State v. Dozier,* 163 W.Va. 192, 197–198, 255 S.E.2d 552, 555 (1979), *citing State v. Hardin,* 91 W.Va. 149, 112 S.E. 401 (1922) (defendant entitled to introduce evidence that decedent was a quarrelsome man who had previously attacked defendant and threatened defendant's life).

We have similarly held that evidence of prior threats and violence is relevant to "negate criminal intent." *State v. Lambert,* 173 W.Va. 60, 63–64, 312 S.E.2d 31, 35 (1984). In *State v. Wyatt,* 198 W.Va. 530, 542, 482 S.E.2d 147, 159 (1996), we explained that a defendant's domestic abuse was relevant "to establish either the lack of malice, intention, or awareness, and thus negate or tend to negate a necessary element of one or the other offenses charged." In *State v. Plumley,* 184 W.Va. 536, 540, 401 S.E.2d 469, 473 (1990) (citations omitted)(emphasis added), we further noted that:

> the reasonableness of an individual's beliefs and actions in self-defense must be ... viewed "in [the] light of the circumstances in which he acted at the time and not measured by subsequently developed facts." *State v. Reppert,* 132 W.Va. 675, 691, 52 S.E.2d 820, 830 (1949). Moreover, we have explained that the *reasonableness of the conduct may depend upon past actions of the decedent,* including threats, violence, and general reputation. *[State v.] W.J.B.,* 166 W.Va. [602,] 614, 276 S.E.2d [550,] 556 [1981].

Finally, in *State v. Summers,* 118 W.Va. 118, 188 S.E. 873 (1936), we addressed a trial court's self-defense instruction very similar to that given in the defendant's case, and which also closely paralleled Syllabus Point 6 of our decision in *McMillion.* In *Summers,* the defendant (Mr. Summers) was convicted of murder and sentenced to life imprisonment following trial. At trial, Mr. Summers had asserted a claim of self-defense. The

evidence showed that the decedent had on previous occasions threatened the life of both Mr. Summers and his wife, and that the decedent had also on a prior occasion threatened to rape Mr. Summers' wife. Mr. Summers testified that he shot the decedent through a screen door, killing the decedent, after observing the decedent threatening his wife with a blackjack. The State's witnesses, however, testified that the decedent "came into the confectionery through the side door without using force toward anyone; that Mrs. Summers was at the time behind the counter waiting on the customers; and that [the decedent] did not get within reach of [Mrs. Summers]." 118 W.Va. at 120, 188 S.E. at 874.

In reviewing the record of Mr. Summers' appeal, we concluded that the trial court had committed plain error by giving the following instruction:

> The court instructs the jury that in determining whether the defendant at the time he shot the deceased was acting in the lawful defense of his wife the jury must believe from the evidence in the case that the *circumstances at the time surrounding the prisoner were such as gave him good cause* to believe, and did believe, that his wife was in *imminent danger of death or great bodily harm* at the hands of the deceased, and it was necessary to fire said shot to protect her from such danger. The acts and conduct, if any, of the deceased at the time and prior to the shooting may be considered by the jury in determining whether the defendant had such cause to believe and fired said shot under such belief, *but no acts or conduct of the deceased prior to that time would excuse the defendant for shooting the deceased.*

*Summers,* 118 W.Va. at 120–121, 188 S.E. at 875. (Emphasis added.)

In reversing the defendant's conviction in *Summers,* we concluded that the instruction permitted the jury to consider the decedent's prior conduct *"only for the purpose* of determining whether the defendant had cause to believe and did believe at the time of the shooting that his wife was in imminent danger of death or great bodily harm at the hands of the deceased." 118 W.Va. at 121, 188 S.E. at 875. We further concluded that the trial court "by so limiting the jury in its consideration of the evidence, committed plain error" on the basis that "the jury should have been permitted to consider the evidence of the previous conduct of decedent for the purpose of determining whether the homicide was murder or manslaughter." *Id.*

It is clear to us that our precedent since *McMillion* provides that the decedent's violent criminal acts and threats of death are relevant to the determination of the subjective reasonableness of the defendant's belief that she was at imminent risk of death or serious bodily injury. This is to say, under the facts of this case, the defendant's subjective belief that death or serious bodily injury was imminent, and that deadly force was necessary to repel that threat, necessarily included the fact that the decedent had, precipitously preceding his death, physically and sexually assaulted the defendant and repeatedly threatened the life of the defendant and the lives of the children.

We therefore hold that where a defendant has asserted a plea of self-defense, evidence showing that the decedent had previously abused[5] or threatened the life of the defendant is relevant evidence of the defendant's state of mind at the time deadly force was used. In determining whether the circumstances formed a reasonable basis for the defendant to believe that he or she was at imminent risk of serious bodily injury or death at the hands of the decedent, the inquiry is two-fold. First, the defendant's belief

---

**5.** By way of analogy, our domestic violence statute, *W.Va.Code,* 48–27–202 [2001], defines "Domestic violence" or "abuse" to mean the occurrence of one or more of the following acts between family or household members, as that term is defined in *W.Va.Code,* 48–27–204: (1) attempting to cause or intentionally, knowingly or recklessly causing physical harm to another with or without dangerous or deadly weapons; (2) placing another in reasonable apprehension of physical harm; (3) creating fear of physical harm by harassment, psychological abuse or threatening acts; (4) committing either sexual assault or sexual abuse as those terms are defined W.Va. *Code,* 61–8b–1, *et seq.,* and *W.Va. Code,* 61–8d–1, *et seq.,* and (5) holding, confining, detaining or abducting another person against that person's will.

must be subjectively reasonable, which is to say that the defendant actually believed, based upon all the circumstances perceived by him or her at the time deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, the defendant's belief must be objectively reasonable when considering all of the circumstances surrounding the defendant's use of deadly force, which is to say that another person, similarly situated, could have reasonably formed the same belief. Our holding in Syllabus Point 6 of *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), is expressly overruled.

■ We further hold that where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent.

Having thus concluded, we find the State's arguments above-described unpersuasive.

### III.2.

### *Duty to Retreat*

In addition to its argument that the defendant's use of deadly force was unreasonable because there had been a "cooling off" period, the State further argues that the same "cooling off" period provided the defendant the opportunity to retreat from her home so as to avoid further attacks. Our review of the record shows that during closing arguments the State advanced this argument, telling the jury that the defendant "could have walked out of that trailer. Period. But she didn't." Implicit in this argument is that the defendant had a duty to retreat from her home.

As a general proposition, our precedent in self-defense cases clearly state that where an unlawful intrusion has occurred in the sanctity of one's home, an occupant of the home has no duty to retreat. Generally described

as the "castle" doctrine, "castle" rule or "home" rule,[6] our precedent succinctly states that "[a] man attacked in his own home by an intruder may invoke the law of self-defense without retreating." Syllabus Point 4, *State v. Preece*, 116 W.Va. 176, 179 S.E. 524 (1935). *Accord* Syllabus Point 1, *State v. W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550 (1981).

The distinction of the present issue is that the decedent was not an intruder, but instead a lawful co-occupant having equal entitlement with the defendant to be present therein. In Syllabus Point 2, *State v. Crawford*, 66 W.Va. 114, 66 S.E. 110 (1909)(emphasis added), we held that:

> On a trial for murder, *instructions to the jury asserting defendant's right to stand his ground and not retreat,* based on the theory of a deadly attack by deceased on, and on defendant in his dwelling, or castle, *are inapplicable where the evidence shows defendant and deceased were at the time of the homicide jointly occupying the house where the killing occurred;* the ordinary rules as to self-defense, propounded in other instructions given at the request of defendant, alone being applicable.

Similarly, in *State v. Boggs*, 129 W.Va. 603, 615–616, 42 S.E.2d 1, 8 (1946), we held that a defendant, who was a co-habitant of a house where the decedent and decedent's wife also lived, was not entitled to an instruction on "defendant's right to stand his ground and not retreat" on the grounds that the decedent was a co-occupant of the same dwelling.

The question that our decisions in *Crawford, Boggs* and other similar cases present is whether we should continue to follow the proposition that an occupant of a home has a duty to retreat when a co-occupant of the same home has attacked or otherwise placed the occupant in danger of serious bodily injury or death. We conclude that we should not.

In reaching our conclusion, we have considered the decisions of other supreme courts that have addressed a similar issue. Initial-

---

**6.** In *State v. W.J.B.*, 166 W.Va. at 607 n. 3, 276 S.E.2d at 553 n. 3, we noted that:

R. Perkins, Criminal Law 1022 n. 1 (2nd Ed. 1969), traces the "castle" rule to this statement:

"... 'the house of everyone is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose; ...' Semayne's Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (1620)."

ly, we note that West Virginia is in the apparent minority of jurisdictions who impose upon an occupant of a home the duty to retreat from an attack by a co-occupant. In *Weiand v. State*, 732 So.2d 1044 (Fla.1999), the Florida Supreme Court was asked to reconsider its earlier decision in *State v. Bobbitt*, 415 So.2d 724 (Fla.1982). In *Bobbitt*, the court made findings similar to those we made in *Crawford*, which is to say that both our decision in *Crawford* and the Florida court's decision in *Bobbitt* held that an occupant of a home had a duty to retreat when attacked by a co-occupant. In concluding that its decision in *Bobbitt* should be vacated, the Florida Supreme Court initially noted that its decision in *Bobbitt* reflected a minority view on the duty of an occupant's duty to retreat, and specifically noted that West Virginia was one of the jurisdictions holding the minority view:

> At the time of our decision in *Bobbitt*, of those jurisdictions imposing a duty to retreat, only four states imposed a duty to retreat when attacked in the home by a co-occupant or invited guest. *See Connecticut v. Shaw*, 185 Conn. 372, 441 A.2d 561 (1981); *Oney v. Kentucky*, 225 Ky. 590, 9 S.W.2d 723 (1928); *New Hampshire v. Grierson*, 96 N.H. 36, 69 A.2d 851

(1949); *West Virginia v. Crawford*, 66 W.Va. 114, 66 S.E. 110 (1909). Since then, one more state has joined their ranks. See *Rhode Island v. Ordway*, 619 A.2d 819 (R.I.1992). Massachusetts, New Jersey and North Dakota have statutes imposing a duty to retreat when attacked in the home by someone with a legal right to be on the premises. See Mass. Gen. Laws ch. 278, § 8A (1998); N.J. Stat. Ann. § 2C:3–4b(2)(b)(i) (West 1998); N.D. Cent. Code § 12.1–05–07(2)(b) (1997). However, the New Jersey Supreme Court has expressed its strong disagreement with the statutorily imposed duty to retreat from the home, and has recently urged the New Jersey legislature to consider amending the statute. See *New Jersey v. Gartland*, 149 N.J. 456, 694 A.2d 564, 569–71 (1997).

*Weiand*, 732 So.2d at 1051 n. 8.[7]

After noting that its earlier decision in *Bobbitt* reflected a minority position, the *Weiand* court went on to conclude that *Bobbitt* should be vacated, holding that:

> There are two distinct reasons for our conclusion. First, we can no longer agree with *Bobbitt's* minority view that relies on concepts of property law and possessory

---

**7.** Our review of other jurisdictions having addressed this issue leads us to conclude that the *Weiand* court's conclusion—that our decision in *Crawford* represents a minority position—is well grounded. *See, e.g., People v. McGrandy*, 9 Mich. App. 187, 156 N.W.2d 48 (1967)(Wife, prosecuted for fatally stabbing her husband, was not obliged to retreat from spouses' dwelling before using extreme resistance in self-defense.); *State v. Glowacki*, 630 N.W.2d 392 (Minn., 2001)("There is no duty to retreat from one's own home when acting in self-defense in the home, regardless of whether the aggressor is a co-resident. But the lack of a duty to retreat does not abrogate the obligation to act reasonably when using force in self-defense. Therefore, in all situations in which a party claims self-defense, even absent a duty to retreat, the key inquiry will still be into the reasonableness of the use of force and the level of force under the specific circumstances of each case."); *Commonwealth v. Derby*, 451 Pa.Super. 100, 678 A.2d 784, (1996.)(Husband and wife have equal right to occupy their home, and wife did not have duty to retreat from marital home, even though safe retreat was possible, before using deadly force against husband at whose hands wife feared death or serious bodily injury.); *State v. Browning*, 28 N.C.App. 376, 221 S.E.2d 375, 377

(1976)("a person is not obliged to retreat when he is assaulted while in his dwelling house or within the curtilage thereof, whether the assailant be an intruder or another lawful occupant of the premises."); *Thomas v. State*, 266 Ark. 162, 583 S.W.2d 32, 37 (1979) ("occupant of house has no duty to retreat from co-occupant, but cannot pursue assailant to continue fight."); *Baugh v. State*, 215 Ala. 619, 112 So. 157, 159 (1927)("A person attacked in his own dwelling, under conditions otherwise entitling him to strike in self-defense, is not required to retreat although his assailant also resides in the same dwelling. There is no place to which the law requires him to retreat."); *Gainer v. State*, 40 Md.App. 382, 391 A.2d 856 (1978) (retreat not required even though the victim sometimes spent the evening at the house); *People v. Lenkevich*, 394 Mich. 117, 229 N.W.2d 298 (1975)("person assailed in his own dwelling is not bound to retreat but may stand his ground and resist attack, whether the attack proceeds from some other occupant or from an intruder."); *State v. Thomas*, 77 Ohio St.3d 323, 673 N.E.2d 1339, 1343 (1997)(same); *State v. Grantham*, 224 S.C. 41, 77 S.E.2d 291 (1953)(same); *State v. Leeper*, 199 Iowa 432, 200 N.W. 732, 736 (Iowa 1924)(same).

rights to impose a duty to retreat from the residence. 415 So.2d at 726. Second, based on our increased understanding of the plight of victims of domestic violence in the years since our decision in *Bobbitt,* we find that there are sound policy reasons for not imposing a duty to retreat from the residence when a defendant resorts to deadly force in self-defense against a co-occupant. The more recent decisions of state supreme courts confronting this issue have recognized that imposing a duty to retreat from the residence has a potentially damaging effect on victims of domestic violence claiming self-defense.

. . .

It is now widely recognized that domestic violence "attacks are often repeated over time, and escape from the home is rarely possible without the threat of great personal violence or death." *[State v.] Thomas,* 77 Ohio St.3d 323, 673 N.E.2d [1339,]1343 [(1997)]. As quoted by the New Jersey Supreme Court:

> Imposition of the duty to retreat on a battered woman who finds herself the target of a unilateral, unprovoked attack in her own home is inherently unfair. During repeated instances of past abuse, she has "retreated," only to be caught, dragged back inside, and severely beaten again. If she manages to escape, other hurdles confront her. Where will she go if she has no money, no transportation, and if her children are left behind in the "care" of an enraged man?
>
> . . . .
>
> What [the duty to retreat] exception means for a battered woman is that as long as it is a stranger who attacks her in her home, she has a right to fight back and labors under no duty to retreat. If the attacker is her husband or live-in partner, however, she must retreat. The threat of death or serious bodily injury may be just as real (and, statistically, is more real) when her husband or partner attacks her in home, but still she must retreat. *Gartland,* 694 A.2d at 570–71 (quoting Maryanne E. Kampmann, *"The Legal Victimization of Battered Women,"* 15 Women's Rts. L. Rep. 101, 112–113 (1993)).

*Weiand,* 732 So.2d at 1051–1053.

In addition to the Florida Supreme Court's decision in *Weiand,* we have considered the supreme court decisions of several other states. One early case of particular note that we find very persuasive on the issue is an opinion written by then New York Supreme Court Judge Cardozo in *People v. Tomlins,* 213 N.Y. 240, 243–244, 107 N.E. 496 (1914). In *Tomlins,* a father killed his son after his son attacked him in the father's home. At trial, the father unsuccessfully claimed self-defense and was convicted of murder. On appeal, the father assigned as error the trial court's instruction that the father had a duty to retreat from his own home before using deadly force.

In reversing the defendant's conviction, Judge Cardozo concluded, in part, that:

> It is not now, and never has been the law that a man assailed in his own dwelling, is bound to retreat. If assailed there, he may stand his ground, and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home. More than two hundred years ago it was said by Lord Chief Justice HALE (1 Hale's Pleas of the Crown, 486): In case a man is assailed in his own house, he 'need not fly as far as he can, as in other cases of *se defendendo,* for he hath the protection of his house to excuse him from flying, for that would be to give up the possession of his house to his adversary by his flight. 'Flight is for sanctuary and shelter, and shelter, if not sanctuary, is in the home. That there is, in such a situation, no duty to retreat is, we think, the settled law in the United States as in England. It was so held by the United States Supreme Court in *Beard v. United States* (158 U.S. 550, 15 S.Ct. 962, 39 L.Ed. 1086). In that case there was a full review of the authorities, and the rule was held to extend not merely to one's house but also to the surrounding grounds.... *The rule is the same whether the attack proceeds from some other occupant or from an intruder.* It was so adjudged in *Jones v. State* (76 Ala. 8, 14). 'Why, it was there

*inquired, 'should one retreat from his own house, when assailed by a partner or co-tenant, any more than when assailed by a stranger who is lawfully upon the premises? Whither shall he flee, and how far, and when may he be permitted to return?'* We think that the conclusion there reached is sustained by principle, and we have not been referred to any decision to the contrary. The duty to retreat, as defined in the charge of the trial judge, is one applicable to cases of sudden affray or chance medley, to use the language of the early books. [Citations omitted]. We think that if the situation justified the defendant as a reasonable man in believing that he was about to be murderously attacked, he had the right to stand his ground.

*People v. Tomlins,* 213 N.Y. at 243–244, 107 N.E. 496. (Emphasis added.)

Based on our review, we see no rational legal basis for imposing upon an occupant of a home the duty to retreat from his or her home and to abandon it to a co-occupant who, by his or her conduct, is engaged in such improper behavior as to place the occupant in danger of death or serious bodily injury. In such circumstances the occupant may use, without retreating, deadly force if the occupant reasonably believes such force to be necessary to prevent his or her death or serious bodily injury presented by the co-occupant's criminal behavior.

■ Accordingly, we hold that an occupant [8] who is, without provocation, attacked in his or her home, dwelling or place of temporary abode, by a co-occupant who also has a lawful right to be upon the premises, may invoke the law of self-defense and in such circumstances use deadly force, without retreating, where the occupant reasonably believes, and does believe, that he or she is at imminent risk of death or serious bodily injury.[9] In determining whether the circumstances formed a reasonable basis for the occupant to believe that he or she was at imminent risk of serious bodily injury or death at the hands of the co-occupant, the inquiry is two-fold. First, the occupant's belief must be subjectively reasonable, which is to say that the occupant actually believed, based upon all the circumstances perceived by him or her at the time deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, the occupant's belief must be objectively reasonable when considering all of the circumstances surrounding the occupant's use of deadly force, which is to say that another person, similarly situated, could have reasonably formed the same belief. Our decision in Syllabus Point 2, *State v. Crawford,* 66 W.Va. 114, 66 S.E. 110 (1909), is expressly overruled.

### III.3.

### *Sufficiency of the Evidence*

We begin our analysis of the sufficiency of the State's evidence by briefly reviewing the required elements of our self-defense doc-

---

8. While we use the terms occupant and co-occupant in our holding, these terms are general in nature and not exclusive of other terms, such as "roommates" or "co-tenants."

9. While we have today set out certain standards under which an occupant of a home, dwelling or place of temporary abode does not have a duty to retreat when attacked by a co-occupant of the same home, dwelling or place of temporary abode, we wish to clarify that this standard is not equal to the standards that have been established for using deadly force against an intruder into a dwelling. Indeed, we do not believe that the use of deadly force by one occupant against a co-occupant presents the same nature of circumstances posed by an intruder into a home. For example, under the law in West Virginia, the occupant of a dwelling may respond with deadly force to an intruder who merely threatens physical violence or the commission of a felony where the occupant reasonably believes that deadly force is necessary. Given that heated exchanges may be commonplace between household occupants, we believe that the greater threat of imminent death or serious bodily injury is necessary to justify the use of deadly force between co-occupants. Therefore, we expressly decline to extend to self-defense cases involving co-occupants our holding in Syllabus Point 2, *State v. W.J.B.,* 166 W.Va. 602, 276 S.E.2d 550 (1981), which provides that:

> The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary.

trine as it pertains to circumstances where one occupant of a home has killed a co-occupant of the same home.

### III.3.A.

### Elements of Self–Defense

More than a century ago, this Court set forth the required elements of our self-defense doctrine in Syllabus Point 7 of *State v. Cain*, 20 W.Va. 679 (1882), where we held that:

> When one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.

In *State v. Hughes*, 197 W.Va. 518, 524, 476 S.E.2d 189, 195 (1996) (citations omitted), we more succinctly stated the elements of our self-defense doctrine as follows:

> [A] defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself.

Our holding in Syllabus Point 7 of *State v. Cain*, and the numerous cases that we have decided under its tenets, makes clear the specific elements and circumstances that must exist before a person's use of deadly force is excusable under our law.[10] The first required element is that a defendant show that he or she was not the "aggressor" and did not provoke the attack. This requirement reflects the common law rule that "one who is at fault or who is the physical aggressor can not rely on self-defense." *State v. Smith*, 170 W.Va. 654, 656, 295 S.E.2d 820, 822 (1982). *See, e.g., State v. Brooks*, 214 W.Va. 562, 591 S.E.2d 120 (2003)(defendant who forced her way into another person's home, then struck resident of the dwelling, was aggressor and therefore not entitled to self-defense instruction even though resident used force to repel defendant).

The second and third required elements are that a defendant show that the circumstances of the attack formed a "reasonable" basis to believe, and that the defendant did believe, that he or she was at "imminent" risk of death or serious bodily injury. As we have held in Section III.1., of this Opinion, the "reasonableness" of a defendant's belief that death or serious bodily injury was "imminent" is both a subjective and an objective inquiry.

The fourth required element is that a defendant must show that his or her actions were "proportionate" to the danger. In *State v. W.J.B.*, 166 W.Va. at 608, 276 S.E.2d at 554, (citations omitted), we noted that:

> the amount of force that can be used in self-defense is that normally one can return deadly force only if he reasonably believes that the assailant is about to inflict death or serious bodily harm; otherwise, where he is threatened only with non-deadly force, he may use only non-deadly force in return.

An example of when the use of deadly force was not reasonable is that set forth in *State*

---

**10.** The elements we set forth in Syllabus Point 7 of our decision in *State v. Cain* can be essentially divided into three categories. The first category sets forth the circumstances which must be shown to have existed when deadly force was used before a person is entitled to claim self-defense, the second category sets forth the actions a person is entitled to take once the required circumstances exist and the third category sets forth how a fact finder should weigh the evidence and what it must find should all the elements be proven.

*v. Wykle,* 208 W.Va. 369, 540 S.E.2d 586 (2000), where we held that the defendant's stabbing of an unarmed victim nine times with a knife was not self-defense, where the only provocation was that the victim slapped the defendant's face during an argument.

■ The final element of our self-defense doctrine requires a defendant to present "sufficient evidence" on all of the above elements before being entitled to a self-defense instruction and shifting the burden of proof to the State. We have previously defined sufficient evidence as being that which creates a reasonable doubt as to whether the defendant acted in self-defense. "Once there is sufficient evidence to create a reasonable doubt that the killing resulted from the defendant acting in self-defense, the prosecution must prove beyond a reasonable doubt that the defendant did not act in self-defense." Syllabus Point 4, *State v. Kirtley,* 162 W.Va. 249, 252 S.E.2d 374 (1978).

### III.3.B.
#### *Application of Facts to the Law*

Having thus briefly reviewed the elements of our self-defense doctrine, we apply them to the facts of the defendant's case to determine, first, whether the evidence was sufficient to create a reasonable doubt on the issue of self-defense, and second, whether the State met its burden to prove beyond a reasonable doubt that the defendant's actions were not self-defense.

### III.3.C.
#### *Whether the Defendant Submitted Sufficient Evidence of her Claim of Self-defense*

■ **Provocation.** There is no evidence in the record that the defendant did any deed or act that provoked the attack upon her by the decedent. Accordingly, not only has the defendant established sufficient evidence that she did not provoke the attack, but this element is proven beyond a reasonable doubt as an uncontested issue.

■ **Reasonableness.** We next turn to the issue of whether the defendant submitted sufficient evidence that she actually believed and had a reasonable basis to believe that she was at risk of death or serious bodily injury as a result of the decedent's conduct. The record is clear that the decedent brutally attacked the defendant during the hours immediately preceding the decedent's death. The State concedes this point, acknowledging that the defendant suffered "an evening of physical and sexual abuse" and "night of terror" at the hands of the decedent. Evidence introduced at the defendant's trial regarding the "evening of physical and sexual abuse" and "night of terror" is summarized as follows.

At trial the State called K.B. to testify as to her recollections of the evening of her sleep over. K.B. testified that she recalled overhearing the defendant and decedent arguing and that the argument appeared to be about the decedent's drinking. At some point during the evening, K.B. testified that the defendant came to their room and told them to go to bed. When asked if there was anything unusual about the defendant when she came to the bedroom doorway, K.B. testified that "She had, like, bruises on her eyes." Following the defendant's instructions, K.B. and A.H. laid down to go to sleep, although K.B. could still hear the defendant and decedent arguing and testified that she was frightened. Finally falling asleep, K.B. testified that she was awakened by sounds of more arguing and, again becoming frightened, woke A.H. to ask her about what was going on. A.H. told K.B. that her parents were probably just "tumbling around" and not to worry about it. K.B., however, testified that she had difficulty trying to get back to sleep, and at one point overheard the defendant say to the decedent that "she didn't want to get killed with her two kids."

After K.B.'s testimony was concluded, A.H. was called to testify as to her recollections of the evening. A.H. testified that she also recalled being awakened by K.B. and that K.B. asked her "Are your parents fighting?" and that "I just figured they were wrestling like we normally do. We used to wrestle all the time, so I told her not to worry about it." A.H. also testified she could hear the defendant and decedent in the other room—"I just heard thumping. I heard thumping." When asked to describe the thumping sounds, A.H. testified that it "[j]ust sounded like they were

stomping their feet or fell on the ground or something. I just figured they were wrestling like we would normally do." After telling K.B. not to worry, A.H. said she fell back to sleep only to be again awakened by K.B., who informed her that B.H. was in the room. Upon seeing B.H. in the room, A.H. testified that she "hollered for mom or one of them to come and get him, and he went back to the living room."

The defendant's youngest child, B.H., was also called to testify. A portion of B.H.'s testimony is as follows:

Q. Did you see Dad hurt Mom that night?

A. I seen him hit her with a back end of a gun.

Q. . . . And when did you—what else happened?

A. They just kept arguing and stuff.

Q. Where was Mom when that happened?

A. When what happened?

Q. When you saw—when you saw Mom get hit with the gun—

A. She was in a recliner.

Q. What kind of gun was it?

A. All I know is it was a black shotgun of some kind.

Q. Where did that gun come from?

A. Out of my dad's back room where he usually kept all of his guns and computer and stuff.

. . .

Q. How did the gun get into the living room?

A. He [Dad] carried it.

Q. . . . Did you see him go get it?

A. Uh-huh.

Q. . . . Why did he go get it?

A. I heard him—I heard them fighting and he said "I am going to go get the gun and shoot you," and that's really the reason I think he got it.

Q. Did you think he was going to shoot Mom?

A. Yeah. But I didn't really think he would have.

Q. Why didn't you think he would?

A. Well, because they—they would fight before and they just get over it and it would be fine the next morning.

When asked to further explain about what he saw and did when the decedent went to get the shotgun, B.H. testified that "I got on mom's lap and asked her, 'What's the matter, Mommie? Is everything going to be okay?' And she said, 'Yeah, it's okay, Bubby. Go back to sleep.'" When asked about seeing the decedent hit the defendant with the gun, B.H. testified that the decedent hit her with the gun in the arms and shoulders. B.H. was also asked, "Do you remember [saying] that you saw [the decedent] take the gun and point it to [the defendant's] belly and asked her if she wanted to die?" B.H. responded "I might remember that." [11]

Dr. Lori Bennet, an Emergency Room physician at Cabell Huntington Hospital, was also called to testify. Dr. Bennet testified that she examined the defendant on the morning of the shooting, and that the defendant informed her she "was assaulted by her husband" and that the circumstances of the assault included that the decedent had "struck her about the head and back with the butt of a gun and threatened her with the gun" and that "she was struck with a fist and gun during the altercation." When asked about what injuries the defendant sustained, Dr. Bennet testified that "she had contusions of both orbital areas, the right upper arm, a puncture wound with a foreign body of the right forearm, contusions of her chest, left facial cheek, the left upper lip" and that "X-rays done at the time demonstrated a nasal fracture."

Photographic evidence of the defendant's injuries described by Dr. Bennet were also introduced during the trial. These photographs depict the defendant with two very large "black eyes," a battered and swollen

11. The record reflects approximately two and one-half years had passed from the date of the decedent's death to the beginning of the defendant's trial. The trial court, observing that the children were having difficulty recalling the events relevant to their testimony, had each of the children read to themselves their respective statements given shortly after the decedent's death as a means of refreshing their memories.

nose, bruised lips, multiple bruising on her breasts, arms, legs, thighs and other parts of her body. A photograph of the shirt worn by the defendant at the time of the decedent's brutal attack was also introduced, which depicted copious amounts of blood on it.

The State Medical Examiner was also called to testify as to his findings. This testimony included serology tests showing that the decedent had a blood alcohol level of 0.22%, which the Medical Examiner testified was nearly three times the 0.08% level where a person would be presumed intoxicated in West Virginia. Also, the autopsy revealed that the decedent had a small gash on his hand that could be consistent with the decedent having struck the defendant in the face.

The defendant also testified on her own behalf. The defendant testified that the decedent started drinking early in the evening and that the decedent started "getting very, very angry" and as the evening wore on, the decedent became increasingly verbally abusive and started making threats that he was going to kill her. When asked what she thought when the decedent said he was going to kill her, the defendant testified "[i]t was a change in him, and I knew it was going to happen." At one point during the ordeal, the defendant testified that her youngest child, B.H., ran over to her and climbed on her lap and asked her what was going on. The defendant testified she told her son that everything would be okay and to go back to sleep "so he couldn't see nothing else."

The defendant further testified that the "beating went on for hours, and it was just a continuous beating and verbal abuse" during which the decedent told the defendant he was going to kill her, that she "wasn't going to live to see the next day" and that "the children wouldn't live." The defendant explained that "I was so scared and I was scared for my life, and not only mine but the three kids that was in my home" and that the decedent even "put the shotgun to my son's head and said he was going to kill him."

When asked what happened after the decedent put the gun to their son's head, the defendant said "I started talking to him so that he would leave B.H. alone and he went back to beating me." The defendant testified

that she knew at this point that "none of us was going to walk out of the house."

As the evening wore on, the defendant testified that the decedent "made me have sex with him. (Crying). After he beat me. (Crying)." Photographic evidence and trial testimony from the State's blood spatter expert established that the decedent, at the time of his death, was lying naked from the waist down on the living room couch (notwithstanding that the three children were nearby) with one leg bent upwards and resting against the back of the couch and the other leg sprawled alongside the edge of the couch.

Following the sexual assault, the defendant testified that the defendant continued to be verbally and physically aggressive, and that the decedent started taunting her, daring her to shoot him or that he would shoot her, and that it was at this point that she got the decedent's shotgun and shot him. The defendant explained that "I thought I was going to die. I knew I was," and that the decedent "would have killed them [the children], too" because the decedent "said that nobody was going to walk out of the house that night."

It is clear to this Court that the evidence adduced at the defendant's trial, only a portion of which we have briefly summarized above, was sufficient evidence that the defendant did believe, and had a reasonable basis to believe, that her life was at risk of death or serious bodily injury.

█ **Imminency.** We next consider whether the defendant submitted sufficient evidence that she had reasonable grounds to believe, and did believe, that the danger of death or serious bodily injury was "imminent." The defendant's testimony established that precipitously preceding the defendant's shooting the decedent, that the decedent sexually assaulted the defendant and thereafter continued to threaten the defendant's life and the lives of the children, as well as physically assault the defendant. Considered in context with the evidence discussed above, and that the violence and threats had been ongoing for several hours, it is clear that the defendant submitted suf-

ficient evidence upon which she could have reasonably believed, and did believe, that death or serious bodily injury were imminent.

■ **Proportionality.** The next element considered is whether the evidence showed the defendant's actions to be "proportionate" to the danger. As we discussed above, the evidence submitted sufficiently established that the decedent had threatened to kill the defendant and the children. Further, the evidence sufficiently shows that the decedent beat the defendant with a deadly weapon— the shotgun—as witnessed by B.H., and testified to by the decedent, and as was further evidenced from the photographs depicting multiple bruises on the defendant's body. In addition, the decedent had placed the shotgun against B.H.'s head and threatened to shoot him. Further, the decedent had sexually assaulted the defendant. Finally, the defendant testified that immediately preceding her shooting the decedent, the decedent had again threatened her life, the lives of the children, and physically assaulted her. This evidence, in the context of all the other evidence, would sufficiently warrant the use of deadly force.

■ **Sufficiency.** The final element considered is whether the defendant met her burden of proof. Our review of the record, discussed above, convinces us that the trial court was correct in its decision to give a self-defense instruction based upon the evidence in this case-the evidence was clearly sufficient to create a reasonable doubt that the killing resulted from the defendant acting in self-defense. Therefore, as we have previously stated, the burden shifted to the State to prove beyond a reasonable doubt that the defendant did not act in self defense. *See* Syllabus Point 4, *State v. Kirtley, supra.*

### III.3.D.
### *Whether the State Met its Burden of Proof*

■ Having determined that the defendant submitted sufficient evidence to create a reasonable doubt as to the issue of whether her actions were made in self-defense, and that the trial judge was correct that the

defendant was entitled to a self-defense instruction, we turn to the issue of whether the State met its burden to prove beyond a reasonable doubt that the defendant's actions were not made in self-defense. Initially, we note that the defendant argues that the State presented no rebuttal evidence in response to her case-in-chief and therefore could not possibly have met its burden of proof. In *State v. McClanahan,* 193 W.Va. 70, 73, 454 S.E.2d 115, 118 (1994), we addressed a similar argument and noted that:

Legally there is a distinction between proof and evidence, and, for this reason, the Court disagrees with the defendant's claim that the State is under a burden to adduce rebuttal evidence. As is stated in 1 F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 1–2(B) (1994):

Proof is all of the evidence before the trier of fact relevant to a fact in issue which tends to establish the existence or nonexistence of such fact. While *evidence* is defined as information received, proof is the persuasion produced by a consideration of the evidence, i.e., the effect of evidence.

Accordingly, the standard is not whether the State presented a rebuttal case, but whether the evidence adduced at trial was sufficient to meet the State's burden of proof.

■ As we previously noted, but repeat herein for context, where the defendant has challenged on appeal the sufficiency of the State's evidence, we view that evidence in the light most favorable to the State. Syllabus Point 1, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). We are further mindful of our holding in *Guthrie* that:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for

a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent our prior cases are inconsistent, they are expressly overruled.

Syllabus Point 3, *State v. Guthrie, supra.*

While we clearly must, according to our precedent, construe the evidence in the light most favorable to the State where a defendant challenges the sufficiency of the evidence, this is not to say that we must abandon sound reasoning in so doing. Instead, we construe the evidence in the light most favorable to the State, and then apply it to the relevant legal standard. In this appeal, the relevant legal standard is proof beyond a reasonable doubt that the defendant did not kill the decedent in self-defense. In *State v. Goff,* 166 W.Va. 47, 272 S.E.2d 457 (1980), we offered a standard jury instruction on the presumption of innocence and burden of proof. This instruction, in part, defined "proof beyond a reasonable doubt" to mean:

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it.

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

*State v. Goff,* 166 W.Va. at 54 n. 9, 272 S.E.2d at 463 n. 9.

Applying these standards, we consider the sufficiency of the State's evidence. Initially, we note that the State candidly acknowledges that the defendant suffered an "evening of physical and sexual abuse" and "night of terror" at the hands of the decedent and thereby concedes many of the facts of consequence in our analysis. However, the State nonetheless maintains that notwithstanding the evening of physical and sexual abuse, "the evidence viewed in a light most favorable to the State suggests that the [decedent] was sleeping when the [defendant] shot him"

and, therefore, that the defendant "shot her unarmed husband while he was lying on his couch" from behind.

As we have noted in this Opinion, the State's argument is premised, in part, upon the incorrect assumption that the decedent's conduct in the hours immediately preceding his death were not relevant to the reasonableness of the defendant's use of deadly force. The State's argument is also premised, in part, upon the incorrect assumption that the defendant had a duty to retreat from her home before using deadly force. With these points made, we examine the sufficiency of the State's evidence.

Having fully considered the record in this appeal, and construing the evidence in the light most favorable to the State, we find that the State's evidence failed to prove beyond a reasonable doubt that the defendant did not have a reasonable basis to believe, and did not believe, that she was in imminent danger of death or serious bodily injury at the time deadly force was used against the decedent. The mere fact that the decedent was found on the couch after being shot creates only a "suspicion or conjecture," *State v. Goff, supra,* that the decedent might *possibly* have been "asleep" or *possibly* have been "passed out drunk," and that the brutal beatings, sexual assault, and threats to kill the defendant and the children had ended.

The fact that even the State cannot say with any certainty the decedent's disposition at the time of his death is compelling evidence of reasonable doubt on this issue. Evidence that the decedent had sexually assaulted the defendant, and thereafter lay sprawled naked from the waist down on the living room couch does not amount to proof beyond a reasonable doubt that the defendant was asleep or passed out drunk; instead, it is equally plausible that the decedent could have been doing exactly what the defendant testified he was doing, which was renewing his threats to kill her and the children and again becoming physically aggressive.

Reviewing the record, there is just no evidence, only conjecture, that the defendant's "night of terror" had ended or that the de-

fendant and the children in her care were safe from death or serious bodily injury. As we have found in Section III.2., of this Opinion, the defendant did not have a duty to retreat from her home before using deadly force against her attacker. Our law entitled the defendant under the circumstances of this case to her subjective belief that she was in imminent danger of death or serious bodily injury and to abate that threat, without retreating, with the use of deadly force.[12] Under the circumstances shown by the evidence in this case, the defendant's use of deadly force to protect herself, without retreating, is subjectively reasonable.

Additionally, the overwhelming evidence demonstrates that any reasonable person similarly situated would have believed that death or serious bodily injury were imminent. Uncontested evidence from multiple witnesses and sources (*e.g.*, the photographs depicting the defendant's numerous injuries and that the decedent was naked from the waist down), as discussed *supra*, established that the decedent's death precipitously followed the decedent's having physically and sexually assaulted the defendant, as well as having threatened—on numerous occasions— the life of the defendant and the lives of the children. Uncontested evidence also established that the decedent was drinking heavily and had a blood alcohol level of 0.22%— nearly three times that where a person would be presumed intoxicated in West Virginia. In this intoxicated state of mind, the uncontested evidence is that the decedent's behavior immediately preceding his death was violent, unpredictable, criminal and placed the defendant at risk of death or serious bodily injury. Under such circumstances the defendant's use of deadly force to protect herself, without retreating, is objectively reasonable. The State's evidence failed to prove other-

wise. Supposition and conjecture are not evidence.

In *State v. Cook*, Justice Davis, writing for the Court, properly noted that while we must be "[m]indful of the jury's province over the evidence presented on the issue of [self-defense], this Court will not permit an injustice to occur because a jury failed to adequately understand the evidence presented at trial." We agree with that principle, and conclude that "[t]his is such a case." *State v. Cook*, 204 W.Va. at 602, 515 S.E.2d at 138. Accordingly, we hold that the State failed to prove beyond a reasonable doubt that the defendant's actions were not made in self-defense and, therefore, the defendant's conviction and sentence must be vacated and this matter remanded for immediate entry of a judgment of acquittal.[13]

## IV.

### *Conclusion*

For the reasons set forth herein, we vacate the defendant's conviction and sentence and remand this matter to the circuit court for entry of a judgment of acquittal on the indictment returned against her in this action. The defendant is ordered released. The Clerk of the Court shall issue our mandate forthwith, which shall direct the circuit court to enter a judgement of acquittal immediately upon receipt of the mandate.

Vacated and Remanded for Judgment of Acquittal.

Chief Justice BENJAMIN dissents and files a separate opinion.

BENJAMIN, Chief Justice, dissenting:

(Filed July 27, 2009)

I dissent because I believe the majority opinion's conclusion that the State failed to

---

**12.** In *State v. Mechling*, 219 W.Va. 366, 379–380, 633 S.E.2d 311, 324–325 (2006), we recognized that "[b]attered women are at an extremely heightened risk of violence—and even death—at the moment they seek to separate from their abusers." It is clear from the record that the defendant was a battered spouse. In addition to the physical and emotional violence we have discussed in detail in this Opinion, the record also shows that the defendant married the decedent when she was sixteen years old, and during her marriage was not permitted to work outside

of the home or family Flea Market booth, have a driver's license, have friends or family to the marital home without the decedent's permission and supervision, and was often unjustly accused by the decedent of seeing other men.

**13.** Because we have found that the defendant's conviction must be vacated and a judgment of acquittal entered, thereby barring retrial, we do not need to address the defendant's remaining assignments of error.

prove beyond a reasonable doubt that the defendant's actions were not in self-defense is erroneous. Here, the defendant resorted to a type of self-help that previously has not been permitted by our law, but that the majority has now vindicated. While there is no doubt that the defendant was brutalized by the decedent, as the jury heard, and that the decedent should have been criminally prosecuted for his actions, I question the wisdom of a self-defense standard in our jurisprudence which sanctions the use of deadly force to defend one's self from a person who is unconscious or incapacitated, and who poses no threat of imminent harm.

I also question how such a lessened self-defense standard, which may be seen by some as condoning or even tacitly encouraging the use of self-help violence or vigilantism in a domestic setting, can be seen as a positive advancement in our efforts to reduce domestic violence. Our focus should be on the reduction of violence, where appropriate, in the domestic setting. Retaining an "imminent harm" requirement for self-defense in the domestic setting achieves this goal while permitting victims the opportunity to meet domestic violence with more domestic violence only when needed to actually defend one's self. In the emotionally charged environment which surrounds domestic violence, I further worry that the rational, objective definition which we may accord to this new standard of "self-defense" in the vacuum of an academic or legal setting will yield to an irrational, self-serving, and narcissistic justification to a troubled mind to, in the spur of the moment, "right" some perceived domestic wrong and thereby defend one's honor as much as one's self. In other words, in the real world, the line between a legitimate and a non-legitimate defense of one's self in a highly charged emotional environment may get blurred—a situation which I fear may work against victims of domestic violence as much as for them.

The evidence presented at trial does not support the defendant's claim of self-defense. The defendant's alleged belief that at the time she used deadly force, that force was necessary to prevent serious bodily injury or death to the defendant is not objectively reasonable under new Syllabus Point 3. In other words, another person, similarly situated, could not have formed the belief that it was necessary to shoot the decedent in the head to prevent serious bodily injury or death to himself or herself. The State presented evidence at trial through the testimony of Dr. Hamada Mahmoud, Chief Deputy Medical Examiner for the State and a forensic pathologist, that the decedent was shot above his right ear with a left and downward trajectory. Dr. Mahmoud also testified that the stippling found around the entrance wound as well as the 25 shotgun pellets and the shell's wadding found in the decedent's brain cavity indicate that the shotgun blast came from close range, specifically one to five feet away. Sergeant David Castle, a Huntington Police Officer, testified that both high and low velocity blood spatter and blood pooling present on the carpet indicated that the decedent was lying flat on his back when he was shot from behind. He further testified from the blood stain evidence that the decedent's left hand was lying just above his head and resting on a pillow, and the decedent's right hand was clutching a blanket. Sergeant Castle concluded from this that the decedent could not have been holding a weapon at the time the defendant shot him.[1] From this evidence, a reasonable trier of fact could conclude that the defendant, while standing behind the decedent, fired a shotgun blast from close range into the right temple of the decedent as he lay flat on the sofa. A rational trier of fact could also infer that because the decedent made no effort to prevent the defendant from walking up to him and firing a shotgun blast into his right temple, the decedent must have been unconscious. Finally, a rational trier of fact could

1. The jury had reason to doubt the veracity of the defendant's testimony at trial. In a recorded statement the defendant gave to Sergeant James M. McCallister of the Cabell County Sheriff's Department on the day of the shooting, which was played for the jury, the defendant did not indicate that the decedent had threatened their son with the shotgun or that the defendant was sexually assaulted by the decedent prior to the shooting. However, in her testimony at trial the defendant claimed that the decedent had put the shotgun to their son's head and threatened to shoot him, and that the decedent had forced the defendant to have sex with him.

additionally infer that because the decedent was unconscious, he could not pose an imminent risk of serious bodily injury or death to the defendant. These reasonable conclusions drawn from the evidence negate the defendant's theory of self-defense.

While I do not disagree with new Syllabus Point 5, it has no application to the facts of this case. Simply because a co-occupant of a residence has no legal obligation to retreat from the residence in the face of the imminent threat of serious bodily injury or death, it does not follow that the co-occupant has the right to shoot an incapacitated person in the head at close range. Because the facts of this case do not support a self-defense claim, Syllabus Point 5 is wholly irrelevant to the decision of this case.

Further, new Syllabus Point 4 was created by the majority from whole cloth and has absolutely no support in the precedent of this Court. Under this Court's precedent, evidence that the decedent had abused or threatened the life of the defendant is admissible to support a self-defense claim but is not admissible to negate a necessary element of the offense charged in the absence of self-defense or other specific defenses enumerated by this Court. In addition, the cases cited by the majority opinion in support of Syllabus Point 4 simply do not stand for the proposition for which they are cited. Specifically, *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979), permitted evidence of physical beatings the defendant had received at the hands of the decedent *where the defendant's primary theory of defense was self-defense.* The same is true of *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401 (1922) in which this Court stated that "where self defense is relied upon to excuse a homicide, and there is evidence tending to establish that defense, it is competent to show the character of the deceased party for violence[.]" 91 W.Va. at 153, 112 S.E. at 402–403. The case of *State v. Lambert*, 173 W.Va. 60, 312 S.E.2d 31 (1984) concerns the effect of the defenses of compulsion, coercion, and duress upon criminal intent and provides that "[t]he compulsion or coercion that will excuse an otherwise criminal act must be present, imminent, and impending, and such as would induce a

well-grounded apprehension of death or serious bodily harm if the criminal act is not done[.]" 173 W.Va. at 62, 312 S.E.2d at 33, *citing* Syllabus Point 1, *State v. Tanner*, 171 W.Va. 529, 301 S.E.2d 160 (W.Va.1982). In the instant case, the defendant did not raise the defenses of coercion, compulsion, or duress. The majority also cites *State v. Wyatt*, 198 W.Va. 530, 482 S.E.2d 147 (1996). However, *Wyatt* concerned the Battered Spouse Syndrome which was not raised by the defendant at trial and was not supported by the evidence. Finally, *State v. Plumley*, 184 W.Va. 536, 401 S.E.2d 469 (1990), and *State v. Summers*, 118 W.Va. 118, 188 S.E. 873 (1936) were both in regard to self-defense or defense of another. In sum, none of the cases cited in the majority opinion stands for the proposition that in the absence of evidence supporting a claim of self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate a necessary element of the offense charged.

Moreover, beside having no support in our law, new Syllabus Point 4 may well have the unintended consequence of promoting vigilantism, an attempt to affect justice by one's own hand according to one's own understanding of right and wrong. The law properly recognizes as a defense to murder that the defendant acted to defend himself or herself from the threat of imminent serious bodily injury or death. Significantly, the threat of serious bodily injury or death must be imminent. An imminent threat of serious bodily injury or death separates a killing in self-defense from a retaliatory killing or a preemptive killing. In other words, the requirement that the threat is imminent distinguishes a killing in self-defense from a killing to redress a previous wrong or to prevent a non-imminent threat. Thus, the law is based on the proper understanding that the recognition of defense of self absent the element of an imminent threat would be to countenance violence and lawlessness. By placing absolutely no limit on the use of evidence of prior abusive conduct to negate an element of the crime charged, the majority unwittingly permits a defendant to claim that the most senseless murder is justified by an allegation that the decedent had wronged the defendant

or posed a threat to the defendant. Until the creation of new Syllabus Point 4, such a notion was totally foreign to our jurisprudence.

Sadly, the majority opinion disregards the progress that this State has made in recent years in the prevention, treatment, and remediation of domestic violence. Thanks to the diligence efforts of our legislature and courts, our society now works to educate, treat, aid, and prevent the scourge of violence among family members. Spouses who find themselves in abusive or threatening situations now have resources that previous generations of abused spouses did not. In the instant case, no reasonable person believes that the appellant should have quietly endured the abusive actions of the decedent. But once the decedent fell asleep or passed out on the sofa, the threat of imminent harm was over and the appellant had several options available short of resorting to homicide.

Finally, in ignoring the evidence presented by the State at trial, the majority of this Court abandons our standard of review and usurps the fact-finding role of the jury. As quoted in the majority opinion, "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, in part, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). First-degree murder is defined, in part, as any "willful, deliberate and premeditated killing." W. Va.Code § 61–2–1 (1991). The State presented evidence that the defendant took a shotgun, walked up behind her unconscious husband lying on the sofa, and fired the shotgun at close range into his right temple. From this evidence, the jury clearly could find that the defendant committed a willful, deliberate and premeditated killing. Further, as noted above, the State presented evidence from which a rational trier of fact could find beyond a reasonable doubt that the defendant's actions were not made in self-defense. This is because a person lying unconscious on a sofa with one hand raised above his head and the other hand clutching a blanket cannot pose an imminent threat of serious bodily injury or death. Therefore, if the majority had properly adhered to the standard of review, it would have been compelled to find that the State presented sufficient evidence to find the defendant guilty of first-degree murder.

In the instant case, the State presented evidence that the defendant shot the decedent from behind at close range in the right temple while the decedent was lying unconscious on the sofa. Because the decedent was unconscious, there was no imminent threat to the defendant when she shot the decedent. The defendant's only real defense was that the decedent had abused and threatened her earlier that evening. Under our law, however, this is not a defense to murder. Therefore, the jury properly found the defendant guilty. Unfortunately, the majority improperly has replaced the sound verdict of the jury with its own idea of justice and created bad law in the process.

While there may be legal error herein on other grounds that merits the reversal of the defendant's conviction and the granting of a new trial, the majority's decision to vacate the defendant's conviction and bar retrial is contrary to the evidence at trial and without support under our law. Accordingly, I dissent.