737 S.E.2d 240

**STATE of West Virginia, Plaintiff below, Respondent,**

v.

**Julia SURBAUGH, Defendant below, Petitioner.**

No. 11–0561.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 18, 2012.

Decided Nov. 20, 2012.

Richard H. Lorensen, Esq., WV Public Defender Services, Charleston, WV, for Petitioner.

Dwayne C. Vandevender, Esq., Prosecuting Attorney of Webster County, Webster Springs, WV, for Respondent.

BENJAMIN, Justice:

This case involves the appeal of the petitioner Julia Ann Surbaugh (hereinafter "petitioner") of her sentence of life without mercy, imposed in the Circuit Court of Webster County by order entered on June 4, 2010, as recommended by the jury which found the petitioner guilty of first degree murder. The petitioner assigned four errors committed by the trial court, including the admission of the decedent's statements, failure to give a *Harden*[1] instruction, failure to give a good character instruction and the failure to suppress the petitioner's third statement to the police. For the reasons set forth herein, we reverse the judgment of the circuit court and remand this case for a new trial.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Julia Ann Surbaugh, was indicted by the Webster County grand jury in January of 2010, charged with the first degree murder of her husband, Michael Surbaugh. At trial, the State proceeded on a theory that the shootings were the result of Mr. Surbaugh's intention to leave his wife to start a life with his paramour. The State also introduced evidence of a financial motivation for the killing: receipt of retirement benefits and an insurance policy. The peti-

1. *State v. Harden,* 223 W.Va. 796, 679 S.E.2d 628 (2009), discussed *infra.*

tioner argued self-defense and evidence of her good character.

On the morning of August 6, 2009, Mr. Surbaugh was shot three times in the face. The petitioner contacted 911 immediately after the shootings. In total, there were four telephone calls between the 911 dispatchers and the petitioner, or persons acting on her behalf and at her direction. In the first brief call to 911, the petitioner advised the authorities that Mr. Surbaugh was trying to shoot himself. She then hung up the telephone. The second call was initiated by the 911 dispatcher. That call was answered by the petitioner, who stated that "Mike shot himself" before hanging up the telephone. The 911 dispatcher initiated the third call, which was answered by the petitioner. The petitioner stated again that her husband shot himself. This phone call ended when the petitioner again hung up the phone. The fourth call was initiated by the 911 dispatcher, and was answered by the petitioner's neighbor, Ann Wilson. Ms. Wilson ended up relaying information from the petitioner to the dispatcher, including the statement that Mr. Surbaugh was trying to shoot her, and that the gun accidentally discharged and struck him. Afterward, she reported, he intentionally shot himself in the head.

Immediately after he was shot, Mr. Surbaugh was able to talk and to walk. He walked out of the home where the shooting took place, and was initially helped by the neighbor, Ann Wilson. When emergency medical personnel arrived at the Surbaugh home, the decedent was seated outside of the home, bleeding from the wounds to his face and head.[2] Ms. Wilson heard Mr. Surbaugh report to the emergency medical personnel that his wife shot him. Mr. Surbaugh also requested that his two cell phones, his glass-es, his wallet, his smokeless tobacco and a plastic bag be brought out of the house.

Corporal E.L. Loughridge of the West Virginia State Police assisted in the investigation of the shooting of Mr. Surbaugh. While at the scene, Cpl. Loughridge overheard Mr. Surbaugh state, to no one in particular, that "the bitch shot me." Cpl. Loughridge testified that at the time of this statement by the decedent, he was being treated by emergency services personnel. He later heard the decedent ask for his smokeless tobacco. Mr. Surbaugh also told the investigating officer, Deputy D. Vandevender[3] of the Webster County Sheriff's Department that "my wife shot me." At the time of this statement the decedent was sitting in a lawn chair in front of his house, talking on his cell phone.

Mr. Surbaugh was medically stable at the scene, according to the trial testimony of the treating paramedic, Dan Moran. Mr. Moran testified that when he arrived at the petitioner and decedent's home, he found Mr. Surbaugh sitting in a lawn chair in front of the house, with several penetrating wounds to the head. He was bleeding from injuries on the right and left side of his head, near his ears. Mr. Surbaugh was alert and oriented to who he was, where he was and what day it was. While Mr. Surbaugh appeared worried, he was relatively calm. Because the original dispatch message to Mr. Moran was that this was an attempted suicide, he questioned Mr. Surbaugh about what he tried to shoot himself with. Mr. Surbaugh replied that he didn't shoot himself, but that "she did," a phrase Mr. Moran understood to mean his wife. Mr. Moran found Mr. Surbaugh to be hemodynamically stable, with good blood pressure, good pulse rate and an appropriate level of consciousness.[4]

Mr. Surbaugh was transported to Webster County Memorial Hospital, where he was

---

2. The petitioner and decedent were married at the time of the shootings, although the decedent had told the petitioner he wanted a divorce and had announced his intentions to leave the home of the petitioner. The decedent and his girlfriend had planned a weekend trip together, intending to depart for a fishing and camping trip later in the day of the shooting. He told his wife that he intended to leave the petitioner's home after he returned from his weekend trip. After he was shot, the decedent left a message for his girlfriend stating that he thought he would be a little late to pick her up for the trip, but that he'd see her in a while.

3. Deputy Vandevender is the brother of the prosecuting attorney for Webster County.

4. At trial, Mr. Moran expressed surprise that Mr. Surbaugh died later in the morning of these injuries.

treated by nurse Sara Wolverton. Nurse Wolverton testified that Mr. Surbaugh stated that he was asleep and felt as though someone had hit him in the head with a baseball bat. He spoke to the nurse about wanting to go camping and fishing, and also about his general condition, including asking whether he was going to die. Nurse Wolverton stated that she told Mr. Surbaugh that he was not going to die, because he was walking and talking when he arrived at the ER. He was also treated by physician's assistant John Blake, who testified at trial that the decedent told him, "I'm not crazy. I didn't do this. This bitch shot me." While there, Mr. Surbaugh also spoke to treating physician Jamie Miller, who testified that the decedent stated that he was lying in bed asleep and he felt as though he got hit with a baseball bat.

Deputy Vandevender later went to Webster County Hospital to take a recorded statement from Mr. Surbaugh. At the time of that statement, Mr. Surbaugh was being treated in the emergency room for the gunshot wounds, and was being prepared to be flown by helicopter to a larger hospital more suited for this type of injury.[5] Deputy Vandevender testified that Mr. Surbaugh stated to several different people on three to four occasions that his wife (sometimes referred to by Mr. Surbaugh as "that bitch") shot him. The deputy later took a formal recorded statement from the decedent while he was in the emergency room, in which he repeated that his wife shot him. Mr. Surbaugh told the deputy that he had been asleep in his bed and felt as though he had been hit in the head with a bat twice. In his recorded statement to the deputy, Mr. Surbaugh said he was sound asleep in bed when he "felt like somebody hit me up beside the head with a baseball bat." He saw the petitioner with the gun, and then took the gun from her. He did not say, however, whether the petitioner shot him. At the time of this formal statement, Mr. Surbaugh appeared to be upset and mad, and physically tired, according to the deputy.

Mr. Surbaugh died four and a half hours after being shot. The evidence adduced at trial was that Mr. Surbaugh suffered three gunshot wounds from a .22 caliber bullet directly to his face. None of the bullets penetrated his skull, but the gunshots did damage his sinus cavity area. The State presented the testimony of the medical examiner that Mr. Surbaugh's death was a result of an air embolism caused by the gunshot wounds. The petitioner presented the testimony of another pathologist who opined that Mr. Surbaugh's death was a result of self-inflicted gunshot wounds. The petitioner's pathologist also sought to cast doubt upon the probability that the death was the result of an air embolism.[6]

Prior to trial, the petitioner sought to suppress the statements made by Mr. Surbaugh from use at trial, arguing that the use of these statements violated the prohibition contained in *Crawford v. Washington*[7], because the declarant was deceased and not available for cross-examination and these statements were testimonial in nature. The State countered by arguing that the statements came in under various exceptions to the hearsay rules, including that the statements were dying declarations, made in anticipation of death, or alternatively, that they were excited utterances. The circuit court found that Mr. Surbaugh was not under the belief that his death was imminent when he made his statements, and as such, they were not admissible under the hearsay exception in Rule 804(b)(2). However, the circuit court found that the statements were admissible under Rule 803(2) as excited utterances, because all of the statements were made within a short time frame after the decedent received his

---

5. The decedent was transferred via ambulance from Webster County Memorial Hospital to a location in Lewis County, where he was scheduled to be flown to Ruby Memorial Hospital's trauma center for further treatment. The decedent was in the helicopter, ready to be flown to Morgantown when he went into cardiac arrest. He was taken to Stonewall Jackson Hospital in Lewis County where he was pronounced dead.

6. At trial, the medical examiner testified that an air embolism occurs when air gets into the heart, blocks the flow of blood and causes sudden death. The doctor referred to an air embolism as "bullets of air."

7. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

injuries and the decedent was still laboring under the stress of that event. The circuit court concluded, without further explanation, that the introduction of Mr. Surbaugh's statements did not violate *Crawford v. Washington*. The circuit court further concluded that the purpose for which the State sought to admit Mr. Surbaugh's statements was material and that the statements were more probative than any other evidence the State could obtain through reasonable efforts.

The petitioner likewise sought to prohibit use of portions of a statement given by her to law enforcement on August 12, 2009,[8] wherein she explained her motivation to shoot her husband and wherein she admitted that she shot him, inapposite to her original statement to the 911 operator that Mr. Surbaugh was trying to kill himself.[9] The petitioner herself initiated the recorded statement, by going to the sheriff's office to speak with investigating officers. This statement was given after she gave two previous statements to law enforcement. Specifically, the petitioner sought to exclude that portion of the statement given after West Virginia State Trooper Jordan entered the room. At that time, the petitioner was answering questions from Webster County Sheriff's Deputy Clayton and Deputy Vandevender. Unbeknownst to the interviewing officers, Trooper Jordan had met with the prosecuting attorney to review the initial results from the medical examiner. Based upon this meeting and the review of the evidence, Trooper Jordan had obtained a warrant for the arrest of the petitioner.

The circuit court found that the petitioner stated that she needed an attorney on three separate occasions during the third statement, but continued to voluntarily talk afterward, without encouragement, coercion or any other involvement by the interviewing officers. The first reference about an attorney was after Deputy Clayton informed the petitioner that Mr. Surbaugh's death had been ruled a homicide by the medical examiner. Petitioner continued her statement after that declaration and asked whether she was going to be placed under arrest. Deputy Clayton responded that an arrest would be coming, and said that he wanted to give her a chance to help herself by being honest and forthright.

The petitioner made a second request for counsel by stating "I need to talk to a lawyer." Deputy Clayton then attempted to end the interview; however, the petitioner asked him to wait a minute. He further attempted to stop the tape recorder but the petitioner stopped him from doing so and voluntarily continued giving her statement. Shortly thereafter she made a third request for counsel. It was after the petitioner ended her statement that she was served with the warrant obtained by Trooper Jordan and was arrested.

After being arrested, the petitioner was taken to be arraigned by a magistrate. The magistrate was not immediately available, so the petitioner had to wait in the company of Trooper Jordan and Deputy Clayton. While neither officer was questioning the petitioner, she nonetheless continued to make statements. The circuit court found that neither Trooper Jordan nor Deputy Clayton was actively questioning the petitioner at the time of these statements. After being arraigned, the petitioner was taken to the sheriff's office for processing. Corporal Loughridge took

---

**8.** The petitioner gave a total of three recorded statements to law enforcement, as well as the previously mentioned calls to 911, and various other statements following her arrest, during the course of her arraignment and processing. Before each statement the petitioner was given a warning pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The first statement was about an hour after Mr. Surbaugh was shot. The second statement lasted about one and a half hours, and was taken on August 11, 2009.

**9.** The petitioner made a number of inconsistent statements about how the decedent was shot. In the initial call to 911, she stated that the dece-

dent was going to shoot himself. In another conversation with 911 dispatchers, she stated that he had already shot himself. She later stated that she and the decedent were in bed, when he suddenly pulled out a gun and stated that he was going to kill her. She claimed that in the ensuing struggle, the gun discharged and the decedent was shot in the face. According to petitioner, he then used the gun to again shoot himself in the head. In her final statement to law enforcement, petitioner stated that she shot the decedent twice in the face, and then he shot himself in the head. At trial the petitioner was cross-examined over these many inconsistencies.

her to her neighbor's house to see her children before returning her to the sheriff's office and transporting her to Central Regional Jail. During this time she continued to make statements to the sheriff, Deputy Vandevender and Corporal Loughridge. The circuit court concluded that these statements were unsolicited and were not made in response to any question that was designed to elicit an incriminating statement from the petitioner.

The circuit court found and also concluded that the petitioner knowingly and intelligently waived her right to counsel, after she asserted that she wanted counsel.[10] The court found that the petitioner had an above average intelligence, and that she understood that she was permitted to have an attorney present if she so chose. She was read her *Miranda* rights prior to each statement.

In terms of whether the petitioner was in custody for the purpose of requiring additional *Miranda* warnings, the circuit court found that while the petitioner could have conceivably been under *de facto* arrest at the time Trooper Jordan arrived in the room, it was the petitioner herself who chose to continue the interviews. The circuit court found that the interviewing officers attempted to stop the interview, but that the petitioner affirmatively wanted to keep talking.

Evidence of the petitioner's good character was introduced, without objection by the State. There was no contest to the petitioner's assertions of having a good reputation, being peaceful, non-violent, a good mother and a supportive wife to her husband.

At trial, the petitioner testified on her own behalf. She acknowledged that she had made many different statements to authorities regarding the shootings. She admitted that she first told authorities that her husband had committed suicide because "I could not tell my boys that I shot their daddy twice, even if it was in self-defense." She stated that while she and Mr. Surbaugh had a number of good years together, the relationship began to deteriorate in 2008 when her husband began abusing alcohol.

The petitioner testified that the problems in her marriage escalated when Mr. Surbaugh, a schoolteacher, began an adulterous relationship with a co-worker. Mr. Surbaugh's girlfriend was a fellow teacher who had become addicted to methamphetamine. The girlfriend testified that while the relationship started out with Mr. Surbaugh supporting her as she attempted to break her addiction to drugs, the relationship soon grew into romance. The petitioner admitted that she was aware of this relationship, and Mr. Surbaugh's paramour confirmed this testimony. In the two years prior to the shootings, Mr. Surbaugh was arrested twice, once while with his girlfriend and once after a drug sweep at the school where he worked, on charges of possession of drug paraphernalia and possession of drugs. At the time of his death Mr. Surbaugh was unemployed, having been discharged by the school board for misconduct.

The petitioner testified that on the night prior to the shootings, she and her husband had argued about his desire to have their children around his girlfriend and other matters. The petitioner testified that her husband blamed her for everything that had gone wrong in the past several years, including his arrests. This argument was after she had spent the day with him clearing out his classroom at the high school. The children were at the neighbor's house for the evening, so there were no witnesses other than the petitioner and her husband. The argument ended when the petitioner walked away and went to bed in her room, leaving her husband in the living room.

Early in the morning of the next day, the petitioner testified that she awoke, made coffee and went into the bedroom then occupied by her husband, for the purpose of retrieving something from a dresser. She testified that Mr. Surbaugh was awake, sitting on the edge of the bed and crying. She testified that she and Mr. Surbaugh crawled into bed together, beside one another, with her head resting on his chest. They remained in this position for

---

10. Despite this finding, the circuit court found that introduction of evidence regarding her waivers to counsel would be prejudicial, and could be used by the jury as an inference of guilty. Therefore, these references were kept out of evidence.

approximately 30 seconds when, according to the petitioner, Mr. Surbaugh got up, leaned over and retrieved a gun. The petitioner stated that Mr. Surbaugh pointed the gun at her, put it in her face and told her, "Bitch, you're not going to destroy me, you're not going to destroy Janet." At that time the petitioner testified that she froze, and Mr. Surbaugh cocked the gun. As he cocked the gun, she stated that he said, "Bitch, you're going to stop setting me up."

The petitioner testified that at this time, all she could think of was that she was going to die and that no one would be there to take care of her children. She stated that she swung her hand toward the gun, causing her husband to become unbalanced. He reportedly then fell toward the top of the bed, and the gun fell from his hand. The petitioner stated that she then grabbed the gun, slipped backward off the bed and ended up in the corner of the bedroom. Mr. Surbaugh continued to come toward her, in a rage, she testified. She stated that she then pulled the trigger and fired off a shot that may have ended up in a closet. Mr. Surbaugh reportedly continued to come toward her and she fired a second shot, which hit her husband in the cheek. The petitioner stated that Mr. Surbaugh then grabbed her and got the gun out of her hand. While stating "you're not going to get me for this, bitch," the petitioner testified the gun went off. The petitioner testified that she did not see where the bullet landed. Afterward, Mr. Surbaugh was bleeding from his face and requested that the petitioner get a doctor. The petitioner stated Mr. Surbaugh then left the room and went into the bathroom, keeping the gun with him. The gun was later retrieved by law enforcement from a laundry basket near the bathroom.

During the petitioner's cross-examination, she was asked questions about Mr. Surbaugh's violence. She testified that he was a loud and physically violent person, but not to her. She denied any prior episodes of domestic violence and related that she had viewed tapes of Mr. Surbaugh's divorce from his first wife in which his ex-wife detailed episodes of physical violence. She stated that she was "not trying to make Mike out as a physically violent person that harmed me." In her earlier statements to law enforcement she denied any physical violence at the hands of her husband.

At trial, the petitioner sought a *Harden* instruction to the jury that would have allowed evidence of Mr. Surbaugh's alleged abuse or threats on the life of the petitioner to be considered. The State argued that this type of instruction was not relevant because there had been no evidence presented that Mr. Surbaugh abused the petitioner. The State also argued that the petitioner was attempting to "sneak in" a battered woman defense when such was not supported by the evidence. The petitioner countered that there was in fact evidence of this abuse presented in the case through the testimony of the petitioner's neighbors. The circuit court found that a *Harden* instruction was not warranted because the facts adduced in the *Harden* case were different than in the present case. The circuit court stated that it "believed that the facts of this case [don't] juxtapose or even closely relate to the heart of the case." The court stated that it did not hear evidence that the petitioner was previously threatened by Mr. Surbaugh. The court concluded that nothing would prevent the petitioner from arguing emotional abuse to the jury, but that an instruction based upon the *Harden* case would be inconsistent with the facts of the case adduced at trial.

The case proceeded to a jury verdict. On May 20, 2010, the jury returned a guilty verdict on the charge of first degree murder. The jury did not recommend mercy and made a specific finding that a firearm was used in the commission of the incident. The petitioner was sentenced to life in prison, without the possibility for parole, and was ordered to pay all costs and court-appointed attorney fees. By order dated February 22, 2011, the petitioner was resentenced for the purpose of perfecting an appeal and for the appointment of appellate counsel. The petitioner's appeal followed.

## II.

### STANDARD OF REVIEW

This appeal presents several questions, each with different standards of re-

view. As a general matter, however, we have held that,

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

■■■ A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard. Syl. pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998). We reiterated this standard when we held,

> Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.

Syl. pt. 1, *State v. Shrewsbury*, 213 W.Va. 327, 582 S.E.2d 774 (2003).

■■■ We review the trial court's jury instructions under the following standard of review,

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. pt. 4, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Further,

> A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syl. pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). Finally, our review of whether the facts support the giving of a particular instruction is based upon a discretionary standard.

> Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution.

Syl. pt. 12, *Id.*

### III.

### ANALYSIS

#### A. Admission of the Statements by Decedent to Various Persons

The first assignment of error propounded by the petitioner is that the lower court erred by admitting statements of Mr. Surbaugh that were testimonial in nature. The petitioner argues that the admission was in violation of the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, as explained in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as well as this Court's admonitions in *State v. James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990), *overruled on other grounds by State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006). The statements in question were made by Mr. Surbaugh to law enforcement and to various other people, including the paramedic taking care of him at his house, the nurse in the emergency room, the physician's assistant and his treating physician. The petitioner argues that the circuit court

erred when it admitted these statements, all taken within the four hours between the shooting and his death, because these statements were testimonial in nature, precluding cross-examination.

The circuit court did not explicitly deem the statements testimonial or non-testimonial, but did find that the statements did not violate *Crawford.* The circuit court found that because Mr. Surbaugh was not under the belief that he was dying, the statements could not come into evidence under the dying declaration exception contained in W. Va. R. Evid. 804(b)(2); however, the Court found that the statements were admissible under the excited utterance exception contained in W. Va. R. Evid. 803(2), because they were made within a short time period after the shootings and while Mr. Surbaugh was still laboring under the stress of that event. On our review of this assignment of error, we must first consider whether the statements are testimonial.

 While the petitioner contends that the statements in question were testimonial, that determination must be made by the trial court. We have explained in *Mechling* the differences between testimonial statements and non-testimonial statements,

Under the Confrontation Clause contained within the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, a testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Syl. pt. 8, *Mechling,* 219 W.Va. 366, 633 S.E.2d 311. Further, in terms of statements made to law enforcement, we held,

Under the Confrontation Clause contained within the Sixth Amendment to the United States Constitution and Section 14 of Article III of the West Virginia Constitution, a witness's statement taken by a law enforcement officer in the course of an interrogation is testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the primary purpose of the witness's statement is to establish or prove past events potentially

relevant to later criminal prosecution. A witness's statement taken by a law enforcement officer in the course of an interrogation is non-testimonial when made under circumstances objectively indicating that the primary purpose of the statement is to enable police assistance to meet an ongoing emergency.

Syl. pt. 9, *Id.*

 Finally, in terms of how to determine whether a statement is testimonial, we directed that,

A court assessing whether a witness's out-of-court statement is "testimonial" should focus more upon the witness's statement, and less upon any interrogator's questions.

Syl. pt. 10, *Id.*

 Examining the circumstances under which Mr. Surbaugh made his statements, we believe the record shows that that these statements were non-testimonial in nature and were, therefore, admissible. At the time these statements were taken, there was a medical emergency in the Surbaugh household. Mr. Surbaugh had been shot, was clearly injured and was in need of medical treatment. Because of the petitioner's conflicting explanations of what had happened, law enforcement had a present need to know what happened from Mr. Surbaugh's point of view, so as to aid their investigation of the shooting and how Mr. Surbaugh was injured. This included a need to ensure that all members of the household were safe and that the neighborhood was safe. Finally, in view of the treatment being rendered, the medical personnel needed to understand the mechanism of how Mr. Surbaugh was injured.

The statement made by Mr. Surbaugh directly to law enforcement is likewise non-testimonial. Again, at the time of this statement, it was still unclear to the officers whether they were dealing with a deliberate shooting by another person who could pose a continuing threat or a suicide attempt. The situation was clearly an emergency.

While the circuit court focused on the hearsay exceptions, as opposed to the nature, i.e., testimonial or non-testimonial, of the statements, the ruling on admissibility of the

statements was correct. We also observe that some of the statements of Mr. Surbaugh about which the petitioner complains were in fact corroborated by her own statement that she shot her husband twice. The circuit court's admission to evidence of all of these statements was not reversible error in regard to *Crawford.*

Having concluded that the circuit court properly determined that the statements of Mr. Surbaugh were not testimonial, and as such, did not violate the Confrontation Clause, we turn to the petitioner's assignment of error regarding admission of the statements under the hearsay exceptions.

 The circuit court held that Mr. Surbaugh's statements to law enforcement were excited utterances under W. Va. R. Evid. 803(2). We have held that the following conditions must be present for statements to be considered as excited utterances:

> In order to qualify as an excited utterance under W. Va. R. Evid. 803(2): (1) the declarant must have experienced a starling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from reflection and fabrication; and (3) the statement must relate to the startling event or condition.

Syl. pt. 7, *State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995). Further, in terms of the trial's court's analysis of whether the statement is the result of the stress of the event as opposed to being the result of reflection and fabrication, we have held,

> Within a W. Va. R. Evid. 803(2) analysis, to assist in answering whether a statement was made while under the stress or excitement of the event and not from reflection and fabrication, several factors must be considered, including: (1) the lapse of time between the event and the declaration; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements.

Syl. pt. 8, *Id.*

 Reviewing the circuit court's findings that the statements were admissible as excited utterances, we find that the circuit court did not abuse its discretion. Mr. Surbaugh's statements happened almost immediately after he was shot in the face. The circuit court did not abuse its discretion by deeming that Mr. Surbaugh had sustained a "startling event or condition," a requirement for an excited utterance.

The next question we consider is whether Mr. Surbaugh's statements were made while he was under the stress or excitement of the event and not from reflection or fabrication. At the time these statements were made, Mr. Surbaugh had just been shot or was seeking emergency medical treatment from the paramedics, nurses and doctors. We do not believe, under these circumstances, that the circuit court erred in concluding that the stress and excitement of the shooting were still present when these statements were made.

The third prong of our analysis requires that Mr. Surbaugh's statements relate to the startling event or condition. The statements clearly relate to the identity of the person who initiated the startling event or condition; i.e., the person who shot Mr. Surbaugh. The third prong of the *Sutphin* test is therefore met.

The circuit court also relied upon the so-called "catch-all exception" to the hearsay rules, contained in W. Va. R. Evid.804(b)(5). The petitioner argues that the circuit court erred in relying upon this exception. We agree. This exception is not necessary when there is another exception upon which the court could base its ruling. Inasmuch as the statements fall within the excited utterance exception, there is no need to delve further into the residual hearsay exception. The circuit court did not commit reversible error in admitting the statements of Mr. Surbaugh.

**B. Admission of the Petitioner's Third Statement to Law Enforcement**

 The petitioner next assigns as error the admission of the portion of her third recorded statement to police in which she explained her motivation for shooting her husband. The petitioner asserts that while the interrogation was initially voluntary, at the time that Trooper Jordan entered the room with an arrest warrant, the nature of

the interrogation changed to a custodial interrogation, and she was entitled to have either a new set of *Miranda* warnings or to have all interrogation cease.

 The petitioner bases her argument on Syl. pt. 4 of *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995), in which we held,

Where police have given Miranda warnings outside the context of custodial interrogation, those warnings must be repeated once custodial interrogation begins. Absent an effective waiver of these rights, interrogation must cease.

The petitioner urges this Court to find that the questions asked by the interviewing detectives after the arrest warrant was obtained were designed to elicit a response concerning her motive for shooting her husband.

In the case *sub judice*, there is no indication that anyone other than Trooper Jordan knew that the arrest warrant had been issued. This lack of knowledge on the part of the interrogating officers is important. Our holding in *Bradshaw* presumes that the interrogating officers know that there has been a change in the custodial status. In the case before us, the presence of the arrest warrant was unknown to the questioning officers, who played no part in obtaining the warrant.

Our standard of review on this issue is deferential. With this standard in mind, we find no error in the circuit court's decision not to suppress a portion of the petitioner's third statement to law enforcement. The decision of the circuit court to admit the entire third statement was not an abuse of discretion, and we affirm the lower court's ruling in this regard.[11]

### C. Instructional Errors: The Failure to Give a *Harden* Instruction and a Good Character Instruction

The final two assignments of error asserted by the petitioner relate to instructional errors. The petitioner first asserts that the failure of the trial court to give an instruction based upon *State v. Harden*, 223 W.Va. 796,

679 S.E.2d 628 (2009), amounted to reversible error. The circuit court found that the facts elicited at trial did not support the giving of this instruction. Furthermore, the petitioner asserts that the failure to give an instruction to the jury about her good character warrants reversal.

 In the *Harden* case, we held that evidence of previous abuse or threats by a victim on the life of the defendant in a murder trial may be relevant to explain the defendant's state of mind at the time deadly force was used. We held,

An occupant who is, without provocation, attacked in his or her home, dwelling or place of temporary abode, by a co-occupant who also has a lawful right to be upon the premises, may invoke the law of self-defense and in such circumstances use deadly force, without retreating, where the occupant reasonably believes, and does believe, that he or she is at imminent risk of death or serious bodily injury. In determining whether the circumstances formed a reasonable basis for the occupant to believe that he or she was at imminent risk of death or serious bodily injury at the hands of the co-occupant, the inquiry is two-fold. First, the occupant's belief must be subjectively reasonable, which is to say that the occupant actually believed, based upon all the circumstances perceived by him or her at the time deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, the occupant's belief must be objectively reasonable when considering all of the circumstances surrounding the occupant's use of deadly force, which is to say that another person, similarly situated, could have reasonably formed the same belief. Our decision in Syllabus Point 2, *State v. Crawford*, 66 W.Va. 114, 66 S.E. 110 (1909), is expressly overruled.

Syl. pt. 5, *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009). We also held in *Harden* that in those cases where a defendant's actions cannot be found to be in self-defense,

---

11. Even if we did not conclude that the officers' conduct did not violate *Bradshaw*, we observe that there was a substantial amount of other evidence upon which the jury could have based its guilty verdict. The petitioner was not prejudiced by the admission of part of her third statement to law enforcement.

evidence of prior abuse or threats may be relevant for some purposes,

> Where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent.

Syl. pt. 4, *Id.*

■ At trial, the petitioner sought a *Harden* instruction to the jury that would have allowed evidence of Michael Surbaugh's alleged abuse or threats on the life of the petitioner to be considered. The State argued that this type of instruction was not relevant, because there had been no evidence presented that Mr. Surbaugh abused the petitioner. The petitioner countered that there had been evidence of abuse presented in the testimony of the petitioner's neighbors and even the Sheriff of Webster County who testified about the petitioner's peaceful nature. The circuit court found that a *Harden* instruction was not warranted. The circuit court stated that it "believed that the facts of this case [don't] juxtapose or even closely relate to the heart of the case."

We have carefully reviewed the evidence, especially the testimony of the petitioner, in the light most favorable to the prosecution, as required under our standard of review. We cannot conclude that the circuit court committed reversible error when it declined to give a *Harden* instruction. While there was certainly evidence of marital discord, there was not sufficient evidence of the alleged threats and abuse requiring the giving of this type of instruction. The petitioner herself, when on the stand testifying on direct examination on her own behalf, did not discuss prior or present day abuse. She presented a case for self-defense, which was argued to the jury, instructed to the jury and eventually rejected by the jury when it returned a guilty verdict against the petitioner. As such, we cannot conclude that the circuit court erred in its rulings.

The final assignment of error relates to the failure of the trial court to give an instruction on the good character of the petitioner. The petitioner argued that her good character was integral to her defense, and the failure to instruct the jury was reversible error. Petitioner's counsel also argues that a good character instruction is present in the standard charges of many other circuit courts in this State. In this case, however, the jury was not instructed as to the petitioner's good character evidence or instructed how to interpret the evidence of petitioner's good character.

The petitioner's requested instruction was as follows:

> Julia Surbaugh has introduced evidence of her good character. Good character is a circumstance to be considered by the jury with all other facts and circumstances in the case on the question of the guilt or innocence of Julia Surbaugh, *and can, alone,* give rise to a reasonable doubt of her guilt on your part; but if you believe Julia Surbaugh is guilty beyond a reasonable doubt, her good character cannot be taken into consideration to mitigate, justify or excuse the commission of the crime. (Emphasis supplied).

■ This instruction is based upon the West Virginia Public Defender Services' book on jury instructions and appears to have been pulled from a series of this Court's older cases, beginning with *State v. Brown,* 107 W.Va. 60, 146 S.E. 887 (1929). In Brown, the defendant was charged with possession of moonshine. He sought an instruction that evidence of good character as proven was sufficient to raise a reasonable doubt as to his guilt. The trial court rejected the instruction. This Court found that "under the peculiar circumstances of the instant case," the failure to give the good character instruction was prejudicial, warranting reversal. In the sole syllabus point, this Court held,

> As a general rule, a trial court is under no duty to correct or amend an erroneous instruction, but where, in a criminal case, a defendant has requested an instruction, defective in some respect, on a pertinent point vital to his defense, not covered by any other charge, and which is supported by uncontradicted evidence; and because

of the state of the evidence relied upon for conviction, and the peculiar facts and circumstances of the case, a failure to instruct on this important point, may work a miscarriage of justice, it is error for the trial court not to correct the instruction and give it in proper form.

Syl., *State v. Brown*, 107 W.Va. 60, 146 S.E. 887 (1929).

██ The petitioner's instruction tends to indicate that evidence of good character, standing alone, could require the jury to return a verdict of not guilty. This type of instruction is often referred to as a "stand-alone" instruction. This Court has not directly spoken on this issue, although the ability of a defendant to place his or her character into evidence before the jury is firmly established. Rule 404(a) of the W. Va. Rules of Evidence provides that while evidence of a person's character or trait of character is not admissible for the purpose of proving that he or she acting in conformity therewith, evidence of a pertinent trait of an accused's character is admissible by the defendant. Good character evidence alone does not constitute automatic entitlement to an acquittal. Once evidence of good character is introduced, the jury must be instructed on how to weigh that evidence.

An early good character instruction cases was *Edgington v. United States*, 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896). The Court stated,

> Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in this case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although, without it, the other evidence would be convincing.

*Edgington*, 164 U.S. at 366, 17 S.Ct. at 73–74, 41 L.Ed. at 471.

Having established that evidence of one's good character may be admissible, we must next determine in what form that instruction should take. Whether a stand-alone instruction is still proper, however, has been the discussion in many cases, including the federal case of *Mannix v. United States*, 140 F.2d 250 (1944). In *Mannix*, the defendant was accused assault with intent to commit rape and of assault. The defendant called five witnesses whose testimony centered on the defendant's reputation for good character. The defendant requested that the court instruct the jury as follows:

> The jury are instructed that the circumstances of a case may be such that an established reputation for good character would alone create a reasonable doubt, although without it the other evidence would be convincing.

The trial court refused to give this instruction, a decision the Fourth Circuit Court of Appeals found proper. The *Mannix* court detailed the divergence amongst the circuits, where some circuits allowed the stand-alone instruction and others disfavored the same.[12] More recently, in the case of *U.S. v. Foley*, 598 F.2d 1323 (1979), the Fourth Circuit Court of Appeals addressed the question of whether the jury should be instructed that evidence of good character, standing alone, would be a sufficient basis upon which to base reasonable doubt. In *Foley*, the defendants were accused of conspiring to fix commissions to realtors in Montgomery County, Maryland. The defendants sought an instruction which instructed the jury that evi-

---

12. As noted in *Mannix*, 140 F.2d at 253: See *Roth v. United States*, 294 F. 475 (6th Cir.1923); *Snitkin v. United States*, 265 F. 489 (7th Cir. 1920); *Egan v. United States*, 52 App.D.C. 384, 287 F. 958 (1923); *Jones v. United States*, 53 App.D.C. 138, 289 F. 536 (1923); *Arnstein v. United States*, 54 App.D.C. 199, 296 F. 946 (1924). On the other hand in *Allen v. United States*, 4 F.2d 688, at pages 694 and 695 (7th Cir.1924), the Circuit Court of Appeals for the Seventh Circuit points out that a request 'that reputation alone may create a reasonable doubt', was properly refused in that such an instruction gives undue prominence to certain evidence, and a similar position is taken by the case court in *Scheib v. United States*, 14 F.2d 75, 79 (7th Cir. 1926).

dence of good character alone may create reasonable doubt. The Fourth Circuit reiterated its agreement with the *Mannix* court that held that the word "alone" need not be included in the charge.

■ We believe the approach espoused in *Mannix* and *Foley* to be the correct approach on the question of whether good character evidence, standing alone from the other evidence before the jury, is sufficient to generate a reasonable doubt. The stand-alone instruction improperly conveys to the jury that even if it finds the State's case compelling, and even if it chooses to disbelief the defendant's testimony and evidence, if the defendant presents evidence of his or her good character that alone may suffice to create reasonable doubt. The stand-alone instruction is an invitation to isolate portions of the evidence, and suggests that this evidence alone be analyzed, as opposed to reviewing all of the evidence in a case. We hold, therefore, that if evidence of the good character of the defendant is properly admitted, the jury should be instructed that this good character evidence may be considered in connection with all the other evidence to generate reasonable doubt. An instruction which states or suggests that good character, standing alone, may generate reasonable doubt is erroneous. To the extent that our previous holdings indicate otherwise, we expressly overrule the same.

■ We therefore reject the notion that this evidence of good character, standing alone, can give rise to a reasonable doubt and would affirm the circuit court's rejection of the proffered instruction, inasmuch as it included the word "alone." The facts surrounding the refusal to instruct on good character are identical to *State v. Brown, supra.* The petitioner requested an instruction, deficient in some respect, on a point vital to her defense that was not covered in the general charge to the jury and which is supported by uncontroverted evidence. Under the limited circumstances of this case, it was error not to give a proper good character instruction. There was no guidance to the jury via specific instruction or by the general charge on how to interpret evidence of good character. Therefore, the instruc-

tional error is sufficient enough to warrant a reversal of the conviction and a remand for a new trial. Upon retrial, the petitioner is entitled to an instruction on good character, if such evidence is introduced.

## IV.

### CONCLUSION

For the foregoing reasons, we reverse the order of the Circuit Court of Webster County entered May 20, 2010, and remand this case for a new trial.

Reversed and Remanded.