**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

**FILED
April 26, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**State of West Virginia,
Plaintiff Below, Respondent**

**vs.) No. 19-1039** (Wood County 18-F-27)

**Stephen Richard Griffith,
Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Stephen Richard Griffith, by counsel Robert F. Evans, appeals the September 18, 2019, order of the Circuit Court of Wood County adjudging petitioner guilty of involuntary manslaughter and wanton endangerment involving a firearm. Respondent the State of West Virginia, by counsel Holly M. Flanigan, filed a response in support of the trial court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the trial court is appropriate under Rule 21 of the Rules of Appellate Procedure.

Chad Hart ("the victim") was shot to death outside of Overtime, a bar in Parkersburg, West Virginia, in the early morning hours of May 7, 2017. The State charged petitioner for the victim's death, indicting petitioner on one count of involuntary manslaughter, one count of wanton endangerment involving a firearm, and one count of brandishing. Petitioner's case proceeded to a jury trial, which began on August 14, 2019. During the three-day trial, the jury heard the testimony of five witnesses from the scene of the shooting—Anthony Venarchick, Dennis Mott, Faith Maston, Richard Harlow, and petitioner; two investigating officers; the State's deputy chief medical examiner; a forensic scientist; and a firearm and tool mark examiner. Petitioner was the sole witness for the defense.

At trial, petitioner testified that, on the evening of May 6, 2017, he drove to the home of his friend, Bob Sadler. At about 8:30 or 9:00 p.m., petitioner rode with Mr. Sadler in Mr. Sadler's Jeep to a bar called Shammy's. Petitioner claimed he had a beer, a shot, and a meal at Shammy's. A third person, Jennifer McGrew, drove her truck to Shammy's to meet with petitioner and Mr. Sadler. Ms. McGrew's sister is petitioner's ex-wife, and petitioner was previously involved in a

sexual relationship with Ms. McGrew.

Petitioner, Mr. Sadler, and Ms. McGrew decided to go to Overtime, and petitioner testified that Mr. Sadler insisted Ms. McGrew drive them there. Petitioner further testified that despite having consumed a couple of drinks, Ms. McGrew drove the trio to Overtime in Mr. Sadler's Jeep. They arrived at Overtime at about 10:30 or 11:00 p.m.

Petitioner testified that, upon arriving at Overtime, he had one drink with Mr. Sadler and Mr. Sadler's friends. Petitioner then testified that at about 11:30 p.m., Ms. McGrew drove him home, where he stayed for about an hour and a half and drank four beers before Ms. McGrew returned to drive him back to Overtime. Petitioner further testified that after he and Ms. McGrew returned to Overtime, he had another beer while talking with a friend.

Dennis Mott testified that, on the evening of May 6, 2017, he and the victim went to Overtime to shoot pool and play poker machines together. They drove separately; Mr. Mott drove his Ford Mustang, while the victim drove his manual transmission Ford Ranger. Mr. Mott claimed that he and the victim each had one drink while at Overtime: a "Captain and Coke." At some point in the early morning of May 7, 2017, Ms. McGrew asked the victim for a ride to her truck at Shammy's, and the victim agreed to drive her there. Mr. Mott testified that he and the victim waited for Ms. McGrew in the parking lot. At approximately 1:45 a.m., Ms. McGrew exited Overtime, followed by Mr. Sadler, who was unhappy that Ms. McGrew was leaving with the victim.

Meanwhile, Faith Maston and her fiancé Richard Harlow were smoking in their vehicle in the parking lot at Overtime. Like Mr. Mott, they saw Ms. McGrew leave Overtime, followed by Mr. Sadler. Also like Mr. Mott, they testified that Mr. Sadler was unhappy that Ms. McGrew was leaving with the victim. An argument ensued involving Ms. McGrew, Mr. Sadler, and the victim. Mr. Mott testified that Mr. Sadler called Ms. McGrew a "whore" and that Mr. Sadler stuck his finger in the victim's face. Anthony Venarchick, who was waiting for a friend outside a home near Overtime, heard the argument and watched the events at Overtime unfold through a line of bushes and trees. Mr. Mott, Ms. Maston, Mr. Harlow, and Mr. Venarchick all testified that they did not see any physical contact between Mr. Sadler and the victim.

Petitioner then exited the bar. There is no dispute that petitioner and the victim began arguing in the parking lot. Petitioner testified that he saw the victim shove Mr. Sadler. According to Ms. Maston's testimony, petitioner seemed angry, and petitioner screamed, "Why did you put your hands on my dad?"[1] Petitioner claimed he told Mr. Sadler to get in the Jeep and instructed the victim to leave. Petitioner testified that the victim replied, "You don't f-ing own me," before the victim walked to his truck, pulled a gun out of the driver's side door, and said "he was gonna kill us." No other witness testified to hearing the victim make this threat or to seeing the victim produce a gun at that point in the argument. According to Mr. Mott, the victim announced, "F--- you, I'm leaving." The victim and Ms. McGrew got into the victim's pickup truck. Ms. Maston and Mr. Mott both testified they saw petitioner punch the tailgate of the victim's truck; however, petitioner testified that it was Mr. Sadler who punched the tailgate of the truck.

---

[1] Mr. Sadler is not petitioner's father.

Mr. Harlow testified that petitioner seemed intoxicated based on his actions and slurred speech. Mr. Venarchick also testified, "Everybody out there appeared drunk to me." Petitioner testified that he had consumed five to six beers and two shots throughout the day and that he was impaired to drive but was not drunk.[2]

Mr. Harlow and petitioner testified that when the victim pulled from his parking place, the victim's truck threw gravel. Mr. Mott pulled his Mustang up to the exit of the parking lot and waited there for the victim to pull up behind him. Because the victim's truck was parked facing away from the exit, the victim drove to the end of the parking lot to turn around before heading toward the exit. Petitioner claimed that while the victim was turning around, the victim did a donut while beating his gun on the top of the truck. No other witness testified to seeing the victim beat a gun on the top of the truck; however, it is undisputed that while the victim turned his truck around, petitioner ran to the Jeep and retrieved his holstered handgun.

Petitioner testified that after he retrieved his handgun, he stepped back toward the edge of the building "to visualize what was gonna happen next, because I was -- feared for my safety." Petitioner further testified that he did not go into the bar because he did not know what the victim "was capable of" and because petitioner "[d]idn't want to get shot in the back and then it would have put everybody else in danger." Mr. Mott testified that he watched someone run across the parking lot and heard "a chamber drop, shell dropped in the chamber" and petitioner say, "I got something for you, mother f-----"; however, Mr. Mott also admitted that his windows were up and that his stereo was on. According to petitioner's testimony, he believed his gun was loaded with six rounds although it could hold seven rounds.

Petitioner testified that, as the victim drove past petitioner toward the exit, the victim swerved the truck toward him. Mr. Mott corroborated this testimony, but he claimed the truck did not come within arm's reach of petitioner. Mr. Venarchick, on the other hand, testified that as the truck pulled through the parking lot, petitioner slammed something metal onto its hood, although Mr. Venarchick was unable to identify the metal object. The truck continued to pull through the parking lot, stopping behind Mr. Mott's vehicle at the exit. Mr. Mott pulled out from the parking lot onto the roadway and began traveling away from Overtime.

Petitioner testified that the victim's truck "backed back down" from the exit toward the parking lot, at which time the victim got out of the truck, lay his gun across the bedrail of the truck and said, "I'm going to f------ kill you." Mr. Venarchick gave similar testimony, stating that he saw the victim leaning on the back of his truck with a gun and heard the victim yell, "You have a gun, mother f-----, so do I." Mr. Venarchick further testified that upon seeing the victim lean on the truck facing petitioner, petitioner then leaned on the Jeep facing the victim. Petitioner testified, "I grabbed my gun out of the holster and jacked one in the chamber and laid it across the hood of the jeep." Mr. Venarchick testified that he heard shouting he described as taunting, the voice saying, "You shoot, mother f-----." Petitioner testified that he told the victim to put the gun down and that "it didn't have to end like this."

---

[2] Petitioner admitted that he told police he had consumed six to seven beers and a couple of shots.

At about 1:50 a.m., at least two shots were fired. Petitioner testified that the victim fired one round at him and that he ducked behind the Jeep before firing one round back. Mr. Venarchick testified that he thought he heard three shots: the first fired by petitioner, the second fired by the victim, and a final shot fired by petitioner. Ms. Maston testified that she heard two or three gunshots, stating that the first two shots sounded like they came from near the trunk of her car, which was parked next to the Jeep, and that the third shot, if there was one, sounded like it came from up near the road. Mr. Harlow testified to hearing two gunshots, stating that both shots sounded as if they came from behind his vehicle and that the shots were about a second apart. Mr. Mott testified that he heard a gunshot as he was driving away from Overtime and that he turned his vehicle around and returned to where the victim's truck was stopped at the exit of Overtime's parking lot. Mr. Mott testified that the victim told him, "I'm f----- fine, let's get out of here," and that when the victim was climbing back into the truck, a second shot rang out, and the victim's headlights "went nuts."

Mr. Harlow testified that after the final shot, the victim's truck shot straight out of the parking lot and across the road. The truck traveled over various curbs before stopping against an embankment. Petitioner testified that upon verifying that the victim had left the parking lot, he holstered his gun and got into the Jeep. Mr. Mott followed the victim's truck, discovered that the victim was unconscious, and attempted to render aid. When Mr. Mott opened the driver's side door of the truck, a gun fell from the truck to the ground. Mr. Mott placed the gun in his Mustang. Meanwhile, Ms. Maston called 9-1-1. Petitioner and Mr. Sadler ultimately drove to where the victim's truck was stopped. Petitioner waited near the truck for police to arrive, while Mr. Sadler drove off. Mr. Mott testified that petitioner repeatedly said, "I didn't shoot."

The victim had been shot once. The bullet passed through the rear window of his truck, the driver's seat, his upper right arm, between his ribs, and through both his lungs, causing extensive internal bleeding. Parkersburg Police Officer Brett Barker arrived and performed CPR on the victim. In his testimony, he described Ms. McGrew as "hysterical" and "shaking." He described Mr. Mott and petitioner as more reserved. Officer Barker testified that he observed "noticeable levels of intoxication with all the parties." Officer Barker obtained the victim's gun, a Taurus Model 709 Slim 9mm pistol, from Mr. Mott's Mustang, testifying that two rounds were missing from the magazine but that one round was chambered, indicating that one round had been fired. Officer Barker also observed a bullet hole in the back window of the victim's truck. On the driver's side floor of the truck, Officer Barker observed an empty spilled beer bottle and a glass smoking device, which he testified was of the sort "commonly used with methamphetamine and/or heroin."

Parkersburg Police Officer Nathaniel Wood also investigated the shooting. He testified that petitioner had bloodshot eyes and the odor of alcohol coming from his person, but that petitioner's blood alcohol concentration was not tested, and petitioner was not taken into police custody. Officer Wood collected two shell casings from the parking lot of Overtime and took photographs outside the bar. None of the investigating officers found a third shell casing, nor did they find a bullet hole other than the one through the back window of the victim's truck. Upon the execution of a search warrant on Mr. Sadler's Jeep, Officer Wood recovered petitioner's Colt 1911 9mm pistol from the back pocket of the front passenger seat. The magazine held five rounds, and Officer Wood testified that the magazine could hold up to nine or ten rounds.

4

Officer Wood also recovered and reviewed security footage from inside and outside Overtime around the time of the shooting. The footage from outside Overtime was played for the jury. Officer Wood noted that although this footage was dark and lacked audio, he could see that while petitioner and the rear part of the victim's truck were in the frame during the shooting, the victim was not in the frame. Officer Wood testified that the footage showed the truck moved back slightly upon reaching the exit of Overtime and that the dome light in the victim's truck came on after the truck stopped. On cross-examination, Officer Wood agreed with petitioner's counsel's representation that photographs depicting frames of the security footage "indicate[d] that [petitioner's] gun[] [was] in his holster on his hip" just before and after the dome light of the victim's truck came on; however, Officer Wood also testified that, "[b]ased on witness testimony, [petitioner] had possibly drawn his weapon before that off video." Officer Wood further testified that the video showed petitioner firing his gun after ducking down and standing back up.

The victim died from his gunshot wound. The victim's toxicology results showed that, at the time of his death, he had a toxic level of methamphetamine and amphetamine in his system, but that he had a blood alcohol concentration of 0.07%.[3] Forensic analysis of the two shell casings obtained from Overtime's parking lot indicated that the shell casing found near the Jeep was fired from petitioner's gun, and the shell casing found near the exit of Overtime was fired from the victim's gun. Gunshot residue testing revealed gunshot residue on petitioner's right hand and face, but no residue was found on petitioner's left hand or the victim's hands or face.

The trial court instructed the jury on the three crimes for which petitioner was indicted. At petitioner's request, the jury was also instructed on self-defense. The jury ultimately returned a verdict of guilty on all three counts of the indictment.

Petitioner filed a motion for a new trial and an amended motion for a new trial, asserting that the evidence was insufficient to support his conviction. Petitioner also filed a motion for post-verdict judgment of acquittal, arguing that the evidence was insufficient to sustain the convictions because the evidence "did not establish each and every element of those charges beyond a reasonable doubt" and because "[t]he evidence clearly established self-defense beyond a reasonable doubt and the State of West Virginia failed to rebut the same." The trial court held a hearing on the motions and a sentencing hearing on September 9, 2019.

On September 18, 2019, the trial court entered an order denying the amended motion for a

---

[3] A person with "an alcohol concentration in his or her blood of eight hundredths of one percent or more, by weight," is considered by law to be in an impaired state. W. Va. Code § 17C-5-2(a)(1)(E).

> Any person who drives a vehicle on any public highway or private road in this state: (1) while he or she is in an impaired state; or (2) while he or she is in an impaired state but has an alcohol concentration in his or her blood of less than fifteen hundredths of one percent, by weight, is guilty of a misdemeanor . . . .

*Id.* § 17C-5-2(e).

new trial and the motion for judgment of acquittal. The trial court also dismissed the conviction for brandishing.[4] The trial court adjudged petitioner guilty of involuntary manslaughter and wanton endangerment involving a firearm, sentencing petitioner to one year of incarceration and five years of incarceration on the charges, respectively. Petitioner's sentences were ordered to run consecutively.

Petitioner now appeals the trial court's September 18, 2019 order. In his sole assignment of error, he argues, "The jury's convictions of [p]etitioner for the offenses of 'wanton endangerment involving a firearm' and 'involuntary manslaughter' require reversal, because neither conviction is based upon sufficient evidence to prove that [p]etitioner did not act in self-defense beyond a reasonable doubt."

We have held that

"[a] reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice." Syllabus point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927).

Syl. Pt. 1, *State v. Easton*, 203 W. Va. 631, 510 S.E.2d 465 (1998). We have further held:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

---

[4] The trial court determined that brandishing is a lesser included offense of wanton endangerment involving a firearm and that petitioner's conviction for brandishing violated double jeopardy principles.

*Id.* at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part; *see also* Syl. Pt. 2, in part, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996) ("When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict."). Thus, pursuant to these standards, we must determine "whether the State submitted sufficient evidence to prove, beyond a reasonable doubt, that the [petitioner]'s actions were not made in self-defense[.]" *State v. Harden*, 223 W. Va. 796, 801, 679 S.E.2d 628, 633 (2009).

Our self-defense doctrine is as follows:

> When one without fault himself is attacked by another in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life, or to do him some great bodily harm, and there is reasonable grounds for believing the danger imminent, that such design will be accomplished, and the person assaulted has reasonable ground to believe, and does believe, such danger is imminent, he may act upon such appearances and without retreating, kill his assailant, if he has reasonable grounds to believe, and does believe, that such killing is necessary in order to avoid the apparent danger; and the killing under such circumstances is excusable, although it may afterwards turn out, that the appearances were false, and that there was in fact neither design to do him some serious injury nor danger, that it would be done. But of all this the jury must judge from all the evidence and circumstances of the case.

Syl. Pt. 7, *State v. Cain*, 20 W. Va. 679 (1882); *see also State v. W.J.B.*, 166 W. Va. 602, 606, 276 S.E.2d 550, 553 (1981) ("The law regarding the use of deadly force in self-defense is often deceptively and simply stated: that a defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself."). In *Harden*, the Court explained that, to rely on a claim of self-defense, a defendant must "show that he or she was not the 'aggressor' and did not provoke the attack. This requirement reflects the common law rule that 'one who is at fault or who is the physical aggressor can not rely on self-defense.'" 223 W. Va. at 809, 679 S.E.2d at 641 (quoting *State v. Smith*, 170 W. Va. 654, 656, 295 S.E.2d 820, 822 (1982)).

Petitioner argues that the "plethora of self-defense evidence" presented during his trial proves that he acted in self-defense and that the evidence presented was "insufficient to prove beyond a reasonable doubt that he did not act in self-defense." He asserts that he was not the aggressor and that he did not provoke the attack. He paints the victim as the aggressor during every stage of the dispute that led to the victim's death.

First, petitioner claims that, at the conclusion of the argument concerning Ms. McGrew, the victim flashed a gun at petitioner and threatened to kill him. Petitioner asserted that these actions made him fear for his safety and prompted him to retrieve his holstered firearm from the Jeep. Upon our review of the trial transcript, we find this description of events was not corroborated by any other witness. Moreover, petitioner's claim that the victim did a donut and beat his gun on

the top of the truck—all while operating a manual transmission—was not corroborated by any other witness. Ms. Maston and Mr. Mott both testified they saw petitioner punch the tailgate of the victim's truck, which petitioner denied doing. A reasonable jury could have concluded that this evidence, when viewed from the prosecution's coign of vantage, marred petitioner's credibility and established that petitioner acted as the aggressor during this stage of the dispute.

Petitioner goes on to assert that the victim swerved toward petitioner, admitting in his brief that petitioner "may have struck the [victim]'s truck." He states, however, that this appeared to be "the end of things" until the victim stopped his vehicle. Petitioner claims that his gun remained holstered as the victim drove through the parking lot; however, Mr. Venarchick's testimony that petitioner struck the victim's truck with a metal object raises doubt as to the veracity of petitioner's claim. Mr. Mott's testimony that he heard a "shell dropped in the chamber" and petitioner say, "I got something for you, mother f------" also calls petitioner's claim into question. Again, viewing the evidence in the light most favorable to the prosecution, we conclude that the jury could have reasonably determined that petitioner struck the victim's truck with his own gun and threatened the victim. Consequently, the jury could have logically concluded that petitioner was the aggressor at this stage of the dispute.

Petitioner contends that, per Mr. Venarchick's testimony, petitioner did not draw his gun and aim it at the victim until after the victim stopped the truck, got out, and drew his gun. Petitioner misrepresents Mr. Venarchick's testimony. Mr. Venarchick testified that after he saw the victim aim his gun at petitioner, petitioner leaned across the front of the Jeep facing toward the victim in a shooting position, aiming his gun at the victim. Critically, Mr. Venarchick did *not* testify that he saw petitioner draw his gun. Although Officer Wood testified that the security footage indicated that petitioner's gun was holstered on his hip when the victim's truck's dome light illuminated, neither Officer Wood nor any other witness testified that the victim drew his gun on petitioner directly before petitioner can be seen in the security footage aiming his gun at the victim. Indeed, other than petitioner's own testimony, there is no direct evidence establishing whether the victim had his gun trained on petitioner before petitioner can be seen in the security footage removing his gun from his hip.

Even assuming the victim exited his truck and drew his gun on petitioner while petitioner's gun remained at his hip, the jury could have rationally determined, beyond a reasonable doubt, that petitioner acted as the aggressor at that stage of the dispute. In *State v. Brooks*, 214 W. Va. 562, 591 S.E.2d 120 (2003), we said:

> [I]n general, the right to self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws from the combat at a time and in a manner to let the other person know that he or she is withdrawing or intends to withdraw from further aggressive action.

*Id.* at 567, 591 S.E.2d at 125 (quoting *State v. Riley*, 976 P.2d 624, 627 (1999)). The jury could have determined, beyond a reasonable doubt, that at no point during the events leading up to the shooting did petitioner take any action adequate to be perceived by the victim as withdrawing or intending to withdraw from further aggressive action. To the contrary, as set forth above, the jury could have reasonably concluded that, only moments before the victim's truck stopped near the

exit of Overtime, petitioner drew his gun, struck the hood of the victim's truck with the gun, and threatened to kill the victim as the victim was driving away. Under those circumstances, the victim would have had the right to defend himself with his own gun. *See id.* ("[A] person has the right to repel force by force in the defense of his person[.]" (quoting *State v. Cook*, 204 W. Va. 591, 598, 515 S.E.2d 127, 134 (1999))). Thus, the jury could have rationally concluded, beyond a reasonable doubt, that the evidence, when viewed in the light most favorable to the prosecution, showed that petitioner remained the aggressor in the moments after the victim's truck stopped, regardless of whether the victim drew and aimed his gun at petitioner before or after petitioner can be seen in the security footage pointing his gun at the victim.

Finally, petitioner contends that he fired on the victim only after the victim fired upon him. Numerous pieces of evidence admitted at the trial place this contention in doubt. Mr. Venarchick, Ms. Maston, and Mr. Harlow all testified that the first gunshot emanated from the area near the Jeep. Mr. Venarchick even testified that he witnessed petitioner shoot first. The victim's shot was not captured on the security footage. Regardless of who shot first, we must recognize that the jury could have reasonably concluded that petitioner took no action that could be perceived by the victim as withdrawing or intending to withdraw from further aggressive action. As such, based on the evidence presented, when viewed from the prosecution's coign of vantage, a rational jury could have concluded, beyond a reasonable doubt, that petitioner was the aggressor in the moments before and during the firefight.

In sum, upon viewing the evidence in the light most favorable to the prosecution and crediting all inferences and credibility assessments that the jury might have drawn in favor of the prosecution, we find that at every stage of the dispute between petitioner and the victim, the jury could have rationally determined, beyond a reasonable doubt, that petitioner was the aggressor. Thus, we conclude that the State submitted sufficient evidence to prove, beyond a reasonable doubt, that petitioner did not act in self-defense when he fired upon the victim.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:**  April 26, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton

9